BENJAMIN H. SMALLEY AND HENRY ADAMS *v.* JOSEPH CLARK, JACOB MAECK, ORLANDO STEVENS AND PHELPS SMITH.

[IN CHANCERY.]

A solicitor in chancery, who is employed to commence and prosecute a suit for the purpose of obtaining for his client an unembarrassed title to land to which he has a claim, and who successfully prosecutes the suit to a final decree, whereby the client obtains the land, has no specific lien upon the land, thus obtained, for the payment of his account for services and expenditures in the prosecution of the suit.

APPEAL from the court of chancery. It appeared, that John Nason, August 20, 1833, being the owner of certain land in St. Albans, subject to the payment of an annual rent to one Jotham Bush, conveyed the same, by deed, to Jonathan M. Blaisdell and received from Blaisdell a bond of defeasance, conditioned for a reconveyance of the land upon payment of the sum of $375,00, with interest, on or before April 1, 1834; and Nason having neglected to make the payment at the day specified, Blaisdell then took possession of the land, and claimed to own it in his own right, free from all equity of redemption; and on the sixth day of April, 1836, Nason assigned the bond of defeasance, and at the same time conveyed all his interest in the land, to Phelps Smith. On the twenty first of July, 1820, Nason, by quitclaim deed, had conveyed all his interest in the same land to his sisters Peggy Nason, Sally Morrill, Betsey Ainsworth and Polly Ryan, and at the September Term, 1827, of Franklin county court, he had consented to a judgment against him, in favor of Jotham Bush, in an action of ejectment brought to recover the possession of the same land. In November, 1836, Phelps Smith applied to the orators, who were partners in business as attorneys at law and solicitors in chancery, and employed them to examine the title to said land, and retained them to commence such suits in law and equity, to recover the possession of the land, as might be deemed necessary, and for that purpose delivered to them the bond of defeasance, above mentioned, and the deeds constituting the evidence of his title to the land. The orators having ascertained, that the title to the land, at law, was in Peggy Nason and her sisters, under the conveyance made by John Nason in 1820, Smith, upon the advice of the orators, purchased the title of Peggy Nason and Betsey Ainsworth to the land and received from them a deed thereof, dated November 21, 1836, and delivered this deed, also, to the orators, for the purposes above named, and the orators, at the request of Smith, and for his benefit, then commenced an action of ejectment, in the name of Peggy Nason, against Blaisdell, to recover the land,—which suit was entered in Franklin county court, April Term, 1837, and was prosecuted by the orators, as attorneys, until September Term, 1845, of said court, when they suffered a discontinuance, without costs, to be entered, for the alleged reason, that Smith had conveyed his interest in the land to the defendants Clark and Maeck,

and they refused to furnish money for the necessary expenses of farther prosecuting the suit. On the fourteenth of February, 1838, Smith purchased of Sally Morrill her title to the land, and received a deed thereof, which he also delivered to the orators. Subsequently the orators, at the request of Smith and for his benefit, commenced a suit in chancery in favor of Smith against Blaisdell, stating the title of Smith to the premises and praying relief, and this suit was entered in court, January Term, 1840, and was prosecuted by the orators, as solicitors, until April Term, 1845, when a decree was made therein by the court of chancery, that Smith, on or before the first day of May, 1845, pay to the clerk of the court $390,60, being the amount specified in the bond from Blaisdell to Nason, with interest to May 1, 1834, and that Blaisdell, within ten days thereafter, release and convey to Smith all his title to the premises, with a covenant of warranty against all claims and demands of any person, claiming said premises, or any part thereof, under Blaisdell, and that Blaisdell pay to Smith the costs of the suit in chancery, taxed at $44,51. While the action of ejectment and the suit in chancery, above named, were pending, Blaisdell filed a bill in chancery against Smith and Peggy Nason, touching the matters in litigation in those suits, and the orators, upon the employment of Smith, defended said suit, and procured a final decree, that the same be dismissed. The orators have retained the possession of the bond of defeasance and the deeds and documentary evidence of the title of Smith to the land from the time the same were delivered to them by Smith, for the purposes above named. On the fourth day of October, 1841, Smith mortgaged this land, with other premises, to one Austin,—who had knowledge of the pendency of the suits above named,—and this mortgage, on the first day of July, 1844, was purchased of Austin by the defendants Clark and Maeck, for valuable consideration,—they then having knowledge of the pendency of the suits above named;—and Clark and Maeck, on the twenty eighth day of April, 1845, paid to the clerk of the court of chancery $390,60, in pursuance of the decree above mentioned, and Blaisdell, on the same day executed a deed of said premises to Smith, and Smith, on the same day, conveyed all his right and title to said premises, by an absolute deed of conveyance, to Clark and Maeck; and Clark and Maeck took possession of the premises, and

subsequently bargained a portion thereof to the defendant Stevens, who entered into possession, but had received no deed and made no payment on account of his purchase. Smith had become insolvent, and there remained due to the orators, for their services and disbursements in the several suits above named, about the sum of $626,00. And the orators insisted, that they had a specific lien upon said land, for the payment of the amount so due to them, and prayed, that the defendants might be decreed to pay to the orators the amount so due to them, or be decreed to release the land to the orators, upon being repaid the amount paid by them to the clerk of the court of chancery, in pursuance of the decree above mentioned,—which sum the orators offered by their bill to pay to the defendants.

The court of chancery dismissed the bill ; from which decree the orators appealed.

*B. H. Smalley* and *C. Beckwith* for orators.

It is well established, that attorneys and solicitors have a general lien upon all the papers and documents of their clients in their possession, not only for their costs and charges in the particular suit, for the prosecution of which the papers were delivered to them, but for their costs and charges for other professional business; and it is submitted, that a solicitor has a lien, for his costs and charges, on the judgment, or estate, recovered by his diligence, as well as upon the mere documentary evidence of title. *Heartt* v. *Chipman*, 2 Aik. 162. *Walker* v. *Sargeant*, 14 Vt. 247. *Hutchinson et al.* v. *Howard*, 15 Vt. 544. *Barnesley* v. *Powell*, Ambl. 102. *Turvin* v. *Gibson*, 3 Atk. 720. 1 Smith's Ch. Pr. 692, 695. 1 Newl. Ch. Pr. 427. 2 Madd. Ch. 571. If the orators have a lien, a court of equity will enforce it. 2 Story's Eq. 571, sec. 1215 *et seq.* This lien cannot be defeated by the bankruptcy, or assignment, of the client. *Heartt* v. *Chipman* and *Hutchinson et al.* v. *Howard,* above cited. *Martin* v. *Hawks,* 15 Johns. 405. Smith never had any legal title to the land in question ; consequently he conveyed none to his grantee Austin by his deed in October, 1841. The defendants have no legal title, upon which they can rest their defence. By their purchase of Austin's interest and by Smith's conveyance to them they have become the mere assignees of the latter's equitable

interest in the estate, with full knowledge of all the infirmities of his title, and subject to all the equities subsisting between him and the orators.

*J. Maeck* for defendants.

We insist, that the orators are not entitled to any part of the relief prayed. The circumstance, that no authority can be brought to sustain it, is conclusive evidence against it. The authorities cited by the orators do not sustain the legal propositions advanced by the bill. Courts of equity have been frequently called upon to protect the solicitor's lien; but it will be found, that the lien has been limited to papers of the client, or to the costs recovered, or funds in court, or to be paid into court. Pow. on Mort. 1063. It will also be found, that the lien of the solicitor is more circumscribed, than that of attorneys in the courts of common law. The solicitor can have no greater aid from the court to secure his lien, than that of the conveyancer, and he can only retain the deeds. *Hollis* v. *Claridge,* 4 Taunt. 807. Pow. on Mort. 1063. The rule in England is, that an attorney cannot take from his client, *ab ante,* a legal mortgage; and if he cannot, it is difficult to perceive, how he can have a lien on the land itself, which, if carried out, is in substance the same. Pow. on Mort. 1064. *Pitcher* v. *Rigby,* 9 Price 79. *Jones* v. *Tripp,* 1 Jac. 322. To allow the lien would conflict with the registry system and with the statute of frauds, would render the title to real estate insecure and uncertain and impede its sale and transfer. The two classes of cases in the English law, which bear the strongest analogy to the doctrine contended for by the plaintiffs, are, first, the vendor's lien for the purchase money, secondly, an equitable mortgage arising from the deposite of title deeds; but it will be found, that the analogy is extremely faint. In the first case payment of the purchase money is an essential part of the contract, and the right of the vendee is not complete, in equity, although a conveyance has been made, until the purchase money is paid. *Per* Ld. ELDON, 2 Rose 328. The case of *Russell* v. *Russell,* 1 Bro. C. C. 269, is the first reported case, establishing an equitable mortgage, since the statute of frauds of 29 *Car.* 2. It was based on a case decided just previous to the statute. The best English judges have considered the doctrine in opposition to the statute and la-

mented the decision, but considered themselves bound by the authorities. *Per* Ld. ELDON, in *Ex parte Coming*, 9 Ves. 115. *Ex parte Wetherell*, 11 Ves. 398. *Ex parte Whitbread*, 19 Ves. 209. *Ex parte Haigh*, 11 Ves. 403. *Norris* v. *Wilkinson*, 12 Ves. 192. Pow. on Mort. 1052.

The opinion of the court was delivered by

BENNETT, J.   It seems, that Phelps Smith, one of the defendants in this bill, claimed title to certain real estate, situate in St. Albans, and that his title to it became embarrassed.   The plaintiffs were employed by Smith to institute proceedings to remove the *cloud*, that was resting upon his title, and at the January Term of the supreme court, 1845, a decree in chancery was obtained in behalf of Smith against one Blaisdell, who was in possession, claiming title, that, upon Smith's paying to Blaisdell a given sum of money, on or before a given day, he (Blaisdell) should give up the possession to Smith, and release to him all right and title, which Blaisdell claimed to the premises.   The money was paid within the time specified by the court, and the release executed by Blaisdell to Smith, and thereupon Smith conveyed to the defendants, Maeck and Clark.   The object of this bill is, to obtain a decree for the payment of the plaintiffs' account against Smith for services as solicitors and moneys paid out in the chancery suit, and also in two other suits particularly set forth in the orators' bill, and, in default thereof, that the defendants be decreed to release and convey to the orators all their title to the premises.   The bill is predicated upon the idea, that the orators had what is called an attorney's *lien* upon the land for the payment of their account, and that the land, from the facts in this case, is chargeable with the *lien* in the hands of Smith's grantees.

The first and only question, which we shall have occasion to examine, is, have the orators any specific *lien* upon this land, as against Smith, which a court of equity can protect and enforce; and if not, this court need go no farther.

It is well understood, that attorneys have a *lien* upon judgments recovered by their clients for their costs.   If the money come to their hands, they may retain it for the amount of their *lien*, and may have an order to restrain their clients from receiving it, until their bills shall have been paid, and may, by giving notice to the judg-

ment debtor, that they rely upon their *lien*, protect themselves, in their *lien* on the judgment against the debtor, from a payment to the creditor; and in the case of *Heartt v. Chipman*, 2 Aik. 162, it was held, that the attorney might maintain an action for money had and received, to the extent of his *lien*, against the assignee of the judgment creditor, to whom the money had been paid.

In the present case, there is no pretence, that the orators had any lien upon the land, while the possession and ostensible title was in Blaisdell, and he is specifically decreed to convey his whole title to Smith. This is done in obedience to the decree of the court. Neither Smith is in the wrong, in taking the title, nor Blaisdell, in conferring it upon him. It may, then, well be inquired, whether, in this situation, an attorney's *lien* can attach to these lands, so as to give the orators, in equity, a paramount control over them?

This is the first instance, that I am aware of, in which it has been attempted to extend the attorney's *lien*, as in this case. In England it is a familiar doctrine, that, in equity, the vendor of real estate has a *lien* upon the land for the unpaid purchase money; but this is upon the ground of a constructive trust,—the vendee holding the legal estate as the trustee of the vendor to the extent of the *lien;* and in the case of *Manly et al. v. Slason et al.*, 21 Vt. 271, this English chancery doctrine was applied in this state, though after considerable hesitation.

In the case of *Russell v. Russell*, 1 Brown's Ch. C. 269, Lord THURLOW introduced the doctrine of equitable mortgages by means of the deposit of title deeds; and though the decision in that case has been since followed in England, yet it has been universally regretted, as being at variance with the statute of frauds, and as leading to discussions upon the truth and probability of evidence, which it was the object of that statute to exclude. The doctrine, no doubt, is founded upon the idea, that a mere deposit of the title deeds furnished evidence of an agreement to make a mortgage. I am not aware, that our courts have ever been called upon to introduce the English chancery doctrine of *equitable mortgages;* and it may well be questioned, whether they will do it, if called upon.

But this doctrine, being founded, if it has any foundation, upon a supposed agreement to make a mortgage, would have but little application to the question now before us. The only case, that I

Smalley et al. *v.* Clark et al.

am aware of, which materially countenances the ground assumed in this bill, is the case of *Barnesley* v. *Powell,* Ambl. 102. That case came up in 1750, by the way of a petition by the solicitor of Barnesley, (*a lunatic,*) setting forth, that he had expended large sums of money in prosecuting suits in chancery and at law in behalf of the lunatic; and the object of the petition was, that the solicitor might be allowed to enter up judgment against the lunatic, in order that he might have a *lien* upon the real estate of the lunatic. This is refused by the chancellor, upon the ground, that no action will lie against the lunatic, but that it must be against the committee of the lunatic, who employed the solicitor. The chancellor says, the committee has a *lien* upon the lunatic's estate; and being willing, as he says, to assist the solicitor what he can, he will declare the solicitor stands in the place of the committee, and has a *lien* upon the lunatic's estate. This case is reported with a *quære,* whether the committee had such a *lien;* and the counsel for the solicitor doubted of it. This case, then, does not establish the point, that the solicitor had a *lien,* except by the way of substitution. The control of the person and estate of a lunatic falls into chancery, and the chancellor commits the custody of the person and estate of a lunatic to a committee, who is to render his account, and may be required to give bonds; and I think this is usual. The committee would doubtless be allowed, in his account, to retain in his hands assets of the lunatic sufficient to balance his account, and in this way have an indirect *lien* on the estate; and probably, as the lunatic is incapable of making any contract with the committee, or the committee with the lunatic, and his whole property is within the control of the court of chancery, it might with propriety be held, that the committee should have a *lien* upon the lunatic's estate. But if so, we think this will not sustain the general proposition of the orators.

It is true, that Lord Hardwick, in this case, observes, " that if a solicitor prosecutes to a decree, he has a *lien* upon the estate recovered, in the hands of the person recovering, for his bills. No such point was before the chancellor for adjudication; and in the case then at bar the chancellor having held, that the solicitor had no right of action against the lunatic, we do not well see, how he could have a *lien* against the lunatic's estate.

Smalley et al. *v.* Clark et al.

If such a *lien*, as is contended for in this case, existed in England, it is somewhat remarkable, that numerous adjudged cases are not to be found, in which it has been recognized and enforced. I am not aware of any such case; and none has been cited on the argument; and the absence of such cases, especially as there would have been frequent occasions for enforcing the *lien*, if it existed, furnishes a strong argument, that no such *lien* does exist. But suppose solicitors, as was said by Lord HARDWICK in *Ex parte Price*, 2 Ves. sen. 407, have an equity allowed them, to be entitled to a satisfaction out of the fund, for their expenses in the case of a lunatic, whether in the way of a suit, or for his costs in taking out a commission of lunacy, the principles claimed by the orators would by no means follow therefrom.

We think, then, to hold that the attorney's *lien* attached to these premises, when conveyed by Blaisdell to Smith, would be introductory of a new principle, and an extension of the doctrine of the attorney's *lien* beyond any adjudged case, and would, in effect, be to create an equitable mortgage, which would be exposed to all the objections, that have been made to the doctrine of equitable mortgages in England, and even more, under our registry system, without having the same plausible ground to stand upon, that is, the presumed agreement to execute a legal mortgage. The result, then, is, the decree of the chancellor, dismissing the bill, should be affirmed, with additional costs in this court.

Let the cause be remitted to the court of chancery, with a mandate for an affirmance of their decree, with additional costs.

ROYCE, Ch. J., did not sit in this case, being related to one of the parties.