CHARLESTON.

*FOWLER *et al* *v.* LEWIS'S ADM'R.

FONTAINE *et al* *v.* FITZHUGH, *et al.*

Submitted February 5, 1891.—Decided February 12, 1892.

1. PERSONAL JUDGMENT—PUBLICATION—LIEN.

A personal judgment for money against a non-resident on publication without service of process or appearance is void, is no lien on land and may be attacked collaterally.

2. BILL IN CHANCERY—DECREE.

A suit against a decedent's representatives to charge his estate with a debt, the pleadings in which contain no allegation of debts against his heirs, and ask no relief as to their debts

*Opinion handed down March 31, 1891 ; reargument allowed upon Swann's Appeal, January 19, 1892; and final decision rendered February 12, 1892

against land descended to them from such decedent, can not be made the vehicle of ascertaining and enforcing personal debts of such heirs against such land.    A decree therein as to that matter would be a nullity.    (p. 127.)

3. BILL IN CHANCERY—DECREE—GUARDIAN AND WARD—INFANTS.
    Nor can a suit brought by a guardian to sell infants' lands, under chapter 128, Code Va. 1860, the bill in which contains no matter as to the existence of debts of the person, from whom their estate descended, and asks no relief in that respect, be made the vehicle to enforce such debts against such lands.    (p. 127.)

4. BILL IN CHANCERY—DECREE—GUARDIAN AND WARD—INFANTS
    If the bill of such guardian, to sell lands of infants held jointly by them and others, alleges it to be for the benefit of all the owners to sell the land as a whole, and makes all the owners parties, and prays a sale of the whole of their interests, and the co-owners with such infants, who are *sui juris*, answer and unite in the prayer of the bill, and ask that the whole land be sold, such co-owners thus make such suit an effective proceeding to sell their land.    (p. 128.)

5. BILL IN CHANCERY—GUARDIAN AND WARD—INFANTS—REFERENCE—CONSENT—STATUTE OF LIMITATIONS—LIENS.
    Two such suits are heard together, and by consent of such parties, who are *sui juris*, and of the guardian of the infants an order is made referring the causes to a commissioner to ascertain debts of the decedent, and also liens against lands descended to his heirs from the decedent for the debt of such heirs.    Such consent by guardian is, as to the infants, ineffectual to make such reference valid to ascertain the liens against the lands of such infants for the debts of their father, who was an heir of said decedent first named, as the suits are not competent to enforce such liens, and such reference will not stop the statute of limitations as to debts against the father of said infants.    But such reference as to others *sui juris* will be valid by reason of their consent to it, and will, as to liens against them, stop the statute at the date of such reference.    (p. 128.)

6. GUARDIAN AND WARD—INFANTS—CONSENT.
    A guardian can not, by consent to a proceeding which would be void and ineffectual to prejudice the estate of infants, render it effectual to prejudice their estate.    (p. 128.)

7. REHEARING—INTERLOCUTORY DECREE.
    There is no statute limiting a petition for rehearing to an interlocutory non-appealable decree.    (p. 130.)

8. SALES—DELAY—INADEQUACY OF PRICE—DEED OF TRUST.
    To set aside a sale under a deed of trust for inadequacy of price, irregularity in, or want of sufficient notice of, sale, or because of incumbrances over the land at the time of sale, a party must proceed without unreasonable delay.    (p. 134.)

9. SALES—NOTICE—DEED OF TRUST.

Publication of a notice of sale under a deed of trust completed before April 1, 1869, when the Code of 1868 took effect, is effectual, notwithstanding that Code provides a different notice, and is saved by section 2, c. 166, Code 1868; and a sale made under such notice, after April 1, 1869, is not for such cause invalid.   (p. 132.)

10. CONSTRUCTION OF STATUTES.

Statutes, though remedial, are to be construed *prima facie* as prospective in operation.   (p. 133.)

11. PARTIES—STRANGER—PROCESS—WAIVER—APPEARANCE.

A petition filed by a stranger to a cause, asking relief against a defendant therein on new matter contained in such petition, must be filed by leave of court, must make such defendant a party to it, and process to answer it must be served on such defendant, unless waived by appearance or otherwise.   (p. 137.)

12. PARTIES—DECREE.

If such defendant ask to become a defendant to such petition, he should be allowed to do so; and, if he be refused the privilege of defending such petition, a decree diverting his property-rights from him on the facts contained in such petition is erroneous. (p. 138.)

13. DECREE—STRANGER—APPEAL.

If such a defendant, by an order in the cause, be allowed to file a petition to set aside a deed from him, vesting such stranger filing the first mentioned petition with the right asserted therein, and the petition of such defendant be dismissed, and an appeal be taken by him, it is error for the court, pending such appeal, to proceed to decree such stranger upon his petition   the relief sought thereby against such defendant.   (p. 139.)

14. ATTORNEY AT LAW—FEES—LIEN—JUDGMENT.

An attorney at law has a lien on a judgment or decree, obtained by him for his client, for services and disbursements in the case, or in a case so connected with it as to form the basis on which such judgment is rendered, or as to be essential to realizing such judgment or decree, but not for services in other cases.   (p. 140.)

15. ATTORNEY AT LAW—LIEN.

A attorney has no lien against land for prosecuting a suit to recover it for his client, or for defending a suit to recover it from his client, or to subject it to a debt or claim.   (pp. 141, 144, 159.)

16. ATTORNEY AT LAW—LIEN.

An attorney has no lien upon the assets of an estate realized from a sale of its lands for defending a suit brought to establish a demand against it.   (pp. 143, 153.)

17. ATTORNEY AT LAW—LIEN.

An attorney has no lien upon a fund arising from sale of land of a person or estate, already owned by such person or estate, for

services purely defensive, in resisting suits brought to establish demands against it. (pp. 143, 153.)

18. CONVERSION.
   Conversion of land into personalty by sale under decree. (p. 150.)

*J. S. Swann & T. B. Swann* for appellants cited 14 Me. 20; 37 N. Y. 505; 6 Johns. 496–498; 3 Harr. 15; 2 U. S. Dig. §§ 237, 238, 242–244, 249, 253, 265, 282, 285; 16 W. Va. 378; 50 Me. 231; 85 Tenn. 506; 76 Ga. 639; 14 Ga. 110; Weeks Att'y at Law, 607, 608–610; Id. 621, 624; 17 Gratt. 304; 14 W. Va. 211; 48 Vt. 52; 55 Pa. St. 437; 113 U. S. 127, 765; 23 Wall. 119, 127; 20 How. 128; Woods Lim. Act. 448 (N. Y.) 463, 464; 105 U. S. 526; 113 U. S. 116; 93 U. S. 352; 45 N. Y. 300; 1 Lans. 55; 75 Va. 508; 6 S. E. Rep. 1; 11 Gratt. 441, p't 3 Syll.; Cool. Const. Lim. 301, 302; 11 N. Y. 281; Sto. Const. 250; 25 Pa. St. 354; 18 Johns. 112; 13 N. Y. 200; 23 W. Va. 139; 18 W. Va. 598; Hill Trusts 478; Id. 852; 17 Ves. 455; 19 Gratt. 592; Id. 610; 15 Gratt. 84; 13 W. Va. 440, 461; Freem. Jdgmts §§ 98, 117; Freem. Jud. Sales § 50; 20 Gratt. 354, 355, p't 11 Syll.; 5 Den. 640; Dan. Ch'y Pl. 1804, 1805; Bar. Ch'y Pr. 345; 3 Otto 353; 1 Wash. 224; 23 W. Va. 579, 592; 9 Johns. 142.

*Watts & Ashby, T. L. Broun* and *W. Mollohan, W. S. Laidley, W. E. Chilton* and *E. W. Wilson* for appellees cited 16 W. Va. 626; 22 W. Va. 456; 23 W. Va. 662;—2 W. & T. Lead. Cas. Eq. 1216; 27 Kan. 195; 7 Mich. 533; 1 Am. & Eng. Ency. Law 959; Mich. Agen. 877–880; 32 W. Va. 297; 6 H. L. 444; 14 Pet. 175; 15 Ves. 224; Pom. Spec. Perf. § 1408; 93 U. S. 274; 83 Am. Dec. 527; 94 Am. Dec. 742; 8 How. 492; 11 How. 437; 12 How. 246; 14 How. 334; 23 W. Va. 487–565; 82 Am. Dec. 724; 14 Abb. Pr. 227; 95 Am. Dec. 446; 46 Ill. 476; 20 Ark. 667; Wait Ac. and Def. 443, 444, 451, 457; 16 Am. Dec. 93, Weeks Attys. 437, 456; 4 W. Va. 539; 22 Gratt. 493; 4 Lans. 67; 7 How. 31; 35 Cal. 463; 10 Cal. 531; Woods Stat. Lim. 269, 272;—16 W. Va. 724; 18 W. Va. 184; 30 W. Va. 248; 12 W. Va. 144; 19 W. Va. 1; 21 W. Va. 469; Id. 503; 23 W. Va. 100; Id. 565; Id. 656; 1 Bart. Ch'y Pr. § 23 (notes); 20 Wall 171; 9 Black 545; 95 U. S. 422; 7 How.

234; 12 How. 209; 2 Wall. 87; 99 U. S. 201; 32 W. Va. 319; Id. 463; 118 U. S. 196; 15 W. Va. 609, 619; Code (1860) c. 117, s. 6; 29 W. Va. 512; Id. (1868) c. 87, ss. 7–10; 16 W. Va. 625.

BRANNON, JUDGE:

On the 13th of March, 1861, James L. Carr instituted, in the Circuit Court of Kanawha county, a chancery suit against the administrator and heirs of John Lewis, deceased, alleging in his bill that he had recovered a judgment for one thousand five hundred dollars, subject to certain credits against John Slack, administrator of John Lewis, based on a note made by Lewis; that Lewis died seised of a large real estate in Kanawha and Boone counties, which by his will he devised to his sons Andrew D. Lewis, John W. Lewis, and James V. Lewis; that a portion of his personal estate he bequeathed to his daughter, Margery L. Kenna, later wife of R. J. Ashby; that all said estate was liable to his debt; and, making the administrator and children of John Lewis, deceased, defendants, the bill prayed that the real and personal estate of said decedent be subjected to the payment of said debt.

The administrator and three of the heirs of John Lewis answered this bill.

In September, 1865, Carlos A. Sperry, as guardian of the infant heirs of Andrew D. Lewis, deceased, one of the heirs of John Lewis, filed in the Circuit Court of Kanawha county a bill alleging that the interests of the infants, as well as of the other heirs, would be promoted by a sale of certain lands on Bull creek, in Boone county, of which John Lewis died seised, and that a sale of it for forty five thousand dollars could be made, and prayed that the said land might be sold, and the proceeds, after paying debts of John Lewis and the dower of his widow, be divided among his heirs. This bill of Sperry, guardian, made the three living heirs of John Lewis and his widow and the infant children of the dead heir, Andrew D. Lewis, defendants.

The three living heirs of John Lewis and his widow filed their joint answer, admitting the allegations of the bill, and uniting in its prayer that said land be sold. An answer for the infants by a guardian *ad litem* was filed.

By power of attorney dated the 24th of November, 1865, the living heirs of John Lewis empowered Thomas L. Brown to sell at fifty two thousand five hundred dollars the land on Bull creek, in Boone county. On the 8th of December, 1865, these three living heirs of John Lewis and his widow and the widow of the dead heir, Andrew D. Lewis, and Carlos A. Sperry, guardian of his children, filed in the suit of *Carr* v. *John Lewis's Adm'r and Heirs,* a petition representing that they had partially contracted with parties in New York for the sale of said land for fifty two thousand five hundred dollars on terms specified, and praying that they be permitted to complete the contract of sale, and that the moneys arising from the sale be deposited in the hands of the receiver of the court, to be disbursed among the creditors of John Lewis, deceased, and among petitioners as might thereafter be determined by the court, alleging that the sale would promote the interest of the children of Andrew D. Lewis, and praying that their interests be sold along with the interests of the others, and that Sperry, their guardian, join in the deed of conveyance, and that, on payment to the receiver of fifty two thousand dollars, a deed conveying the land be made to the purchaser.

On the 8th of December, 1865, depositions were taken in the said case of Sperry, guardian, to prove the advisability of selling the land. On the 19th of December, 1865, a decree was entered in the cases of *Carr and others* v. *The Adm'r of John Lewis and others,* and *Sperry, Guardian* v. *Heirs of John Lewis and others,* hearing the causes on their papers, and said petition asking leave to make such sale, and such leave was granted with consent of parties, and the petitioners and Sperry, guardian for the infants, were authorized on payment of purchase-money to the receiver, to convey the land. The decree declares itself to be a consent decree, and that its object was to effect a sale, "and to subject the proceeds arising therefrom, when paid into the hands of the receiver, to the rights of the said parties, as the land is now liable."

With further consent the decree referred the two causes to a commissioner, to ascertain and report after publication (1) of what land John Lewis died seised; (2) what judg-

ments were rendered against him in his lifetime, and against his administrator; (3) what other liens by judgment trust-deed, attachment or otherwise existed on said lands; (4) what judgments had been rendered against John W. Lewis, Margery J. Ashby, James V. Lewis and Andrew D. Lewis, constituting liens on the land; (5) to settle accounts of John Lewis's administrator.

The parties consenting to this decree were Sperry, guardian of Andrew D. Lewis's children, Lovell, attorney for Lewis's heirs, and Sperry, attorney for Carr. Polsley, commissioner under said reference on the 2d of June, 1866, filed a report finding certain debts against John Lewis's estate, and a judgment of six hundred dollars in favor of Sarah E. Lewis against Andrew D. Lewis and John W. Lewis; a judgment for four hundred and fifty four dollars in favor of Sarah E. Lewis against Andrew D. Lewis; a judgment in favor of James Hewitt against Andrew D. Lewis; a judgment in favor of James V. Lewis against John W. Lewis; a judgment in favor of Samuel Lewis, use of Andrew M. Henderson, against John W. Lewis; a judgment in favor of Boteler & Clagett against John W. Lewis; a trust-deed from John W. Lewis to secure Thomas L. Broun, maker, and John M. Doddridge, indorser, of a negotiable note, the proceeds of which were for the benefit of John W. Lewis; and a trust-deed made by John W. Lewis, to secure Summers & Patton and N. & H. Fitzhugh a debt—all which were reported as liens on said lands. There were no exceptions to this report, and on the 15th of October, 1866, an order was made simply confirming said report and going no further.

On the 8th of October, 1867, a decree was entered in the Carr suit reciting that John W. Lewis, Richard J. Ashby and Margery J. Ashby, Eliza D. Lewis, and Sarah E. Lewis, by their agent and attorney, Thomas L. Broun, filed a report, and that it appeared therefrom that acting substantially under a former decree they had given Broun a power of attorney to sell the land, and that Broun had sold it to Andrew J. Bininger for fifty two thousand five hundred dollars, of which two thousand five hundred dollars was to go to Broun as commission under the provisions of the

power, and the residue to be subject to the proper decrees of the court, and that the heirs of John Lewis asked for a confirmation of the sale; and that Sperry, guardian of Andrew D. Lewis's heirs, consented, and confirming such sale, and directing the receiver to collect from the purchaser, Bininger, the purchase-money when due. Sperry guardian and others signed this decree. No heir of John Lewis did so except John W. Lewis.

On the 13th of November, 1869, a rule was awarded against Bininger to show cause why the land should not be resold, he having failed to pay purchase-money; and on the 21st of June, 1870, a decree was entered directing the resale of said Bull Creek land, six thousand and six acres, appointing Nicholas Fitzhugh special commissioner to make sale.

On the 6th of December, 1870, W. L. Cochran, administrator of Sarah E. Lewis, James V. Lewis, Richard J. Ashby and Margery, his wife, obtained an injunction restraining Fitzhugh, as commissioner, from selling said land under said decree, but on the 17th of April, 1871, the injunction was dissolved, and an appeal was taken to the order of dissolution.

A decree made the 25th of June, 1872, shows that a certain fund arising from a debt assigned by Andrew Donnally to John Lewis was applied in payment of the debts against John Lewis's estate, which had been reported against it by Commissioner Polsley.

On the 27th of June, 1872, an order was made stating that the two causes of *Carr* v. *Heirs of John Lewis*, and *Cochran, Adm'r etc.* v. *Nicholas Fitzhugh*, which had been pending in the Court of Appeals had been dismissed in the Court of Appeals. They were ordered to be reinstated in the Circuit Court, and, with like consent, those causes were referred to Joseph Ruffner, as special commissioner, to ascertain and report (1) what lands John Lewis died seised of; (2) who were his heirs; (3) how the lands were to be divided, and what part each heir was entitled to; (4) what judgments, trust-deeds or other liens were on the lands against the heirs, jointly or separately; (5) the total indebtedness of each heir for which his real

estate was bound; (9) what transfers of the real estate had been made by the heirs; (7) to settle the account of John Slack, as administrator d. b. n. of John Lewis.

On the 1st day of October, 1874, Commissioner Ruffner filed a report, to which exceptions were taken, and on the 7th of July, 1872, a decree held invalid three judgments therein reported against Andrew D. Lewis, viz., one in favor of James Hewitt, one in favor of Thomas B. Wallace, and one in favor of Sarah E. Lewis for four hundred and fifty four dollars. As the debt of Carr, for which the suit of *Carr* v. *the Heirs of John Lewis* was instituted, had been paid, an order made 29th May, 1876, substituted E. M. Fowler as plaintiff therein, and it thereafter proceeded in Fowler's name as plaintiff; and Cochran, administrator of Sarah E. Lewis, having died, an order was made reviving, in the name of Peter Fontaine, administrator of Sarah E. Lewis, the case of *Cochran, Adm'r* v. *Nicholas Fitzhugh.*

On the 11th of April, 1884, the two cases of *Fowler* v. *Heirs* and *Adm'r of John Lewis,* and *Fontaine, Adm'r of Sarah E. Lewis* v. *Nicholas Fitzhugh and others,* were recommitted to Commissioner Ruffner to report on questions raised by exceptions to his report not already adjudicated, and the liens against the Bull Creek lands, and settle account of John Slack, administrator of John Lewis.

On the 1st of July, 1885, on a petition filed by Fontaine, administrator of Sarah E. Lewis, and Wallace and Hewitt, a decree was entered setting aside as null and void the decree of the 7th of July, 1882, which had held void, and, as not liens, the three judgments of Hewitt against Andrew D. Lewis, Wallace against Andrew D. Lewis, and that for four hundred and fifty four dollars of Sarah E. Lewis against Andrew D. Lewis, and overruled exceptions to Ruffner's report ascertaining these judgments as liens.

On the 14th of July, 1885, the administrator, widow and children of Andrew D. Lewis filed a petition asking that the decree of the 15th of October, 1866, be set aside. That decree, as above stated, confirmed a report made by Commissioner Polsley finding certain judgments against Andrew D. Lewis as liens on his interest in said land. This peti-

tion made no formal parties, but all the judgment-creditors appeared to it, and objected to its being filed; but the court allowed it to be filed and, on the 14th of July, 1885, rendered a decree vacating and setting aside the decree of the 15th of October, 1866, so far as it affected any judgment against Andrew D. Lewis, and directing Commissioner Ruffner, who had the case before him, to inquire into the said judgments and report upon the question of their validity. This decree contained a clause declaring that the consent-decree of reference of the 19th of December, 1865, should not be affected by it. John W. Lewis gave a deed of trust on the 19th of November, 1860, on his interest in the Bull Creek land, to secure a five hundred dollar debt to Summers & Patton and N. & H. Fitzhugh; and at a sale under it, on the 5th of April, 1869, Nicholas Fitzhugh and Lewis Summers purchased the entire interest of John W. Lewis in said Bull Creek land, and it was conveyed to them by Thomas B. Swann, trustee. The deed of trust and deed from trustee were recorded in Boone county, the 16th of October, 1872. Lewis Summers conveyed half of his interest to Nicholas Fitzhugh by deed, January, 1872, thus giving Fitzhugh a three fourths interest.

Fitzhugh, being thus interested in John W. Lewis's share in the land, on the 15th of July, 1885, filed a petition asking that the order of reference of 19th of December, 1865, and the decree of 15th of October, 1866, confirming Polsley's report under it, be set aside; and on 15th of July, 1885, a decree was rendered stating the tendering of the petition, and that certain creditors of Andrew D. Lewis had objected to it, and overruling their objections, and allowing the petition to be filed, and vacating said decree of 15th of October, 1866, confirming Commissioner Polsley's report, so far as said decree of confirmation affects the four judgments against John W. Lewis, referred to in Polsley's report, and leaving those judgments open for future adjudication, and directing that all questions submitted to a commissioner by the decree of 19th of December, 1865, be submitted to Commissioner Joseph Ruffner to take evidence, and report on all matters involved in the cause.

On 17th of March, 1890, Commissioner Ruffner filed his

report under the several orders of reference to him.    This report held invalid and as no liens all the judgments filed against Andrew D. Lewis, except a six hundred dollar judgment in favor of Sarah E. Lewis, and all the judgments filed against John W. Lewis, except one in favor of R. J. Ashby.

Exceptions to this report were filed because of its rejection as liens of nine judgments, and an exception was taken by the representatives of Andrew D. Lewis because the report allowed the six hundred dollar judgment in favor of Sarah E. Lewis against Andrew D. Lewis.

On the 1st of July, 1890, a decree was pronounced which held void and rejected as liens the nine judgments disallowed by Ruffner's report, and also rejected the six hundred dollar judgment of Sarah E. Lewis, which that report had allowed as a lien.    The owners of these rejected judgments, Fontaine, administrator of Sarah E. Lewis, and others have appealed from said decrees of 14th July, 1885, 15th July, 1885, and 1st July, 1890.

Nicholas Fitzhugh having acquired an interest in John W. Lewis's share in the Bull Creek land, as above stated, in his petition filed 15th July, 1885, asserted his right, and on the same day John W. Lewis filed an answer to said petition and afterwards an answer and cross-bill, seeking to overthrow the sale under the deed of trust to Fitzhugh, and other pleadings were filed between them.    By decree of 2d July, 1890, the court held that the sale to Fitzhugh was valid, and adjudged to the parties claiming under that sale the right to John W. Lewis's interest in said land.    From said decree of 2d July, 1890, John W. Lewis has appealed.

On January 10, 1871, an agreement was made between James V. Lewis and Thomas L. Broun, reciting James V. Lewis's interest in the personal and real estate of his father, John Lewis deceased, and that there was then much litigation respecting it, and giving to Broun for his services, in such litigation one third of all James V. Lewis's interest in said estate, and one third of a judgment of James V. Lewis against John W. Lewis.    Later, by deed dated March 6, 1883, James D. Lewis, and Sarah E., his wife, conveyed to Thomas L. Broun a judgment of one hundred and

two dollars against John W. Lewis, a claim of five hundred dollars against Margery and R. J. Ashby, payable out of the Bull Creek land, and all right, title and interest which James V. Lewis and his wife held in the Bull Creek land.

On September 17, 1888, Broun filed before Commissioner Ruffner a petition alleging, among other things, that he was entitled under said deed to one fourth interest in the Bull Creek land, and to the judgment of one hundred and two dollars against John W. Lewis, and to the claim of five hundred dollars in favor of James V. Lewis against Margery and R. J. Ashby. This petition of Broun asked that out of the purchase-money of the Bull Creek land he should be paid the claims set up in the petition.

On the 27th March, 1889, in court, James V. Lewis and Sarah E. Lewis filed an answer and cross-bill to the said petition of Broun, and Broun was required to answer it; but later the court struck out this answer and cross-bill, and refused James V. Lewis and wife leave to become defendants to Broun's petition, and overruled Lewis's motion to strike out of the case the petition of Broun. But a few days later the court made an order in the case of *Fowler et al* v. *Lewis's Heirs et al,* showing that James V. Lewis and wife tendered their petition, in the nature of an original bill, and ordering it to be filed, and that process issue on it against T. L. Broun and other parties defendant to answer the same. This petition, in the nature of an original bill, on various grounds attacked the agreement of January 10, 1871, between John W. Lewis and Broun and said deed of 6th March, 1883, between Lewis and wife and Broun, and prayed that they be held for naught and set aside.

Afterwards James V. Lewis and wife filed an amended petition, making new parties. Broun filed his answer, and a litigation was had between James V. Lewis and wife and Broun touching said Broun's rights under said contract and deed upon the branch of the cause based on the said petition, in the nature of an original bill filed by James V. Lewis and wife ; and on 8th April, 1890, a decree was made in the cause as to that litigation, declaring that Lewis and wife were not entitled to the relief they prayed for, and dismissing their said petition. From this decree James V.

Lewis and wife took an appeal, which is now pending in this Court.

Ruffner's report, referring to Broun's said petition filed before Ruffner, reported that Broun was entitled to James V. Lewis's entire interest in the Bull Creek lands, to the judgment in favor of James V. Lewis against John W. Lewis, and to a claim of six hundred and eighty two dollars payable out of Mrs. Ashby's interest in the Bull Creek land, which claim James V. Lewis had assigned to Broun; and, James V. Lewis and wife having excepted to the report, the court entered a decree on 2d July, 1890, which overruled said exception, and confirmed Ruffner's report in this respect, and declared Broun entitled, as found by the report, to all the proceeds arising from such assignment. From this decree of July 2, 1890, James V. Lewis and wife took an appeal.

John S. Swann filed, January 18, 1886, petitions numbered 1 and 2, alleging in the first petition, that John Lewis had died owner of a large personal and real estate, leaving a will, which excluded a daughter, Mrs. Kenna, later Mrs. Ashby, from participation in his estate, and that she had brought suit to invalidate the will, and secure an equal share as one of the four children; and that a decree therein gave her participation in the personalty but excluded her from the realty of her father, including about six thousand acres of land on Bull Creek; that afterwards, by a compromise, she was accorded a fourth interest in said land; that he (Swann) was employed as sole counsel to defend, and did defend, the suit so brought by Mrs. Kenna; and he claimed a fee of one thousand, five hundred dollars, and asked that he be allowed said fee out of the fund which should come into the hands of the court from the sale of the Bull Creek land.

In the second petition Swann alleged that Joab and Thomas Fowler had, in the year 1858, brought a suit against the estate of John Lewis, seeking to render it accountable to a large demand in favor of the estate of Thomas Fowler by reason of an alleged joint ownership of lands by Fowler and Lewis, and the sale of lands by Lewis, and his receiving moneys therefor, held in trust by Lewis for the

common benefit of Lewis and Fowler; that he (Swann) had, as attorney for Andrew D. Lewis in his own right as a child of John Lewis, and as administrator of John Lewis, filed an answer and argued the cause in defence of said suit; that, while the commissioner reported fifty thousand dollars in favor of Fowler's estate against the Lewis estate, a compromise decree was entered, giving Fowler's estate seven thousand five hundred dollars. Swann asked the court to allow him for his attorney's fee one thousand dollars for such service, and to pay it as a lien out of the proceeds of the Bull Creek land.

Swann filed an amended petition to his petition No. 1, alleging that, in the suit mentioned in petition No. 1, *Kenna and Wife* v. *Lewis's Adm'r and others*, he, as attorney, represented all the defendants, the widow, the administrator and three out of the four heirs; and he added matter not in the petition No. 1, that, in the case of *Carr's Adm'r* v. *Lewis and others*, later prosecuted in the name of *E. M. Fowler* v. *R. J. Ashby and Wife and others*, he, as a matter of course, represented the widow of John Lewis, and Andrew D., James V., and John W. Lewis, and Margery Kenna, his heirs, and Andrew D. Lewis, executor of John Lewis, and his successor, and the executor of Sarah E. Lewis, and A. D. Lewis's administrator, and making a claim against all for his attorney's fee. Swann filed an amended petition to his petition No. 2, alleging that in said suit of *Fowler* v. *Lewis's Adm'r and others*, he represented the widow and all the four heirs of John Lewis, and his executor, Andrew D. Lewis, and makes his claim for attorney's fee against all of them, and against John Slack, administrator *d. b. n.* of John Lewis, and against the administrator of Sarah E. Lewis, and asks that the proceeds of the sale of the Bull Creek land be made liable therefor.

The claims sought to be enforced by Swann were contested, and Commissioner Ruffner reported against them, and the court by decree on July 1, 1890, held that Swann had no lien upon the fund in the hands of the court as the proceeds of the sale of the land nor on the land, and that Swann take nothing by his petitions; and from this decree J. S. Swann has appealed.

APPEAL OF JUDGMENT CREDITORS, FONTAINE, ADMINISTRATOR,
AND OTHERS.

Take the judgment of Sarah E. Lewis against Andrew D. Lewis for four hundred and fifty four dollars. The process in the action in which it was rendered was not served, but returned, "Not found and no inhabitant," and there was an order of publication against the defendant as a non-resident, and without appearance a personal judgment was rendered. There was no jurisdiction in the court to confirm the office-judgment, and it is utterly void; for there was no process served nor appearance, and not even attachment of property. Such a judgment is no lien and may be attacked in a collateral proceeding. *Houston* v. *McCluney*, 8 W. Va. 135; *Capehart* v. *Cunningham*, 12 W. Va. 750; opinion in *Wilson* v. *Bank*, 6 Leigh, 574; *Wynn* v. *Wyatt*, 11 Leigh, 584; *Pennoyer* v. *Neff*, 95 U. S. 715; *Gray* v. *Stuart*, 33 Gratt. 351; *Underwood* v. *McVeigh*, 23 Gratt. 409; Freem. Judgm. § 495; 1 Black, Judgm. §§ 220, 227; *Lamar* v. *Hale*, 79 Va. 147; *Wade* v. *Hancock*, 76 Va. 620; *Windsor* v. *McVeigh*, 93 U. S. 274; *Hahn* v. *Kelly*, 94 Amer. Dec. 742; *Cooper* v. *Reynolds*, 10 Wall. 318; *Harris* v. *Hardeman*, 14 How. 334.

Even if there be attachment of effects of non-residents, a personal judgment on publication without service of process or appearance is a nullity, except as to effects attached. *O'Brien* v. *Stephens*, 11 Gratt. 610; Black, Judgm. § 231; *Cooper* v. *Reynolds*, 10 Wall. 318; *Coleman* v. *Waters*, 13 W. Va. 278; *Gilchrist* v. *Oil, etc. Co.*, 21 W. Va. 115.

For the same reasons the judgments in favor of Thomas B. Wallace against Andrew D. Lewis, the judgment in favor of James Hewitt against Andrew D. Lewis, the judgment in favor of James V. Lewis against John W. Lewis, the judgment in favor of Samuel Lewis, for the use of Andrew M. Henderson, against John W. Lewis, the judgment in favor of James A. Lewis against John W. Lewis, the judgment in favor of James Dolan and S. Chambers against John W. Lewis, the judgment in favor of Thomas B. Wallace against John W. Lewis, and the judgment in favor of Boteler & Claggett against John W.

Lewis, are not judgments creating liens. None of these judgments, of their own force, create liens.

But, though they do not themselves operate as liens, does the decree of reference made by consent, December 19, 1865, directing the commissioner to report all liens against, not only John Lewis, but also his children, and the report of Polsley, reporting certain ones of the above mentioned judgments as valid liens, and the decree of October 15, 1866, confirming that report, operate to make such judgments binding liens? The order of reference was made in the suit of *Carr* v. *The Adm'r and Heirs of John Lewis*, and the suit of Sperry, guardian of the infant children of Andrew D. Lewis, deceased, heard together. The former suit was a bill by Carr to enforce a judgment against the administrator of John Lewis against lands and personalty in the hands of his heirs and administrator, asking that such assets of his deceased debtor be subjected to pay his debt. It did not allege or seek to enforce any liens against the heirs of John Lewis; it had no two objects in view, but only the single one just specified. Not a particle of matter did the bill contain of any indebtedness of the children of John Lewis, nor did it ask any relief against them on that score.

A judgment or decree is the sentence and adjudication made by the law, spoken through a court, upon facts admitted or proven. There can be no judgment or decree without matters of fact alleged. Freem. Judgm. § 2; Black, Judgm. § 1. For want of allegation in Carr's bill that those persons, who as heirs of John Lewis owned his lands, owed debts constituting liens on the land, and of a prayer for relief as to such debts, if that matter could properly have been put in the same bill, the court itself could have entered no decree for the sale of the land for the debts of such heirs, as it would be void, and, of course, could not make a reference to ascertain such debts. *McCoy* v. *Allen*, 16 W. Va. 724; *Chapman* v. *Railroad Co.*, 18 W. Va. 184; *Rickard* v. *Schley*, 27 W. Va. 633; *Shaffer* v. *Fetty*, 30 W. Va. 248 (4 S. E. Rep. 278).

The other suit of Sperry, guardian, was a suit under the statute (Code Va. 1860, c. 128) to sell lands of infants; and

if we could say that in such proceeding, as incident to sale, there could be an ascertainment of the debts of the father of the infants and a decree therefor, yet there is not allegation or whisper in this bill of any debts owing from Andrew D. Lewis or prayer for relief as to them. So this suit could not be made a vehicle for the ascertainment and enforcement of liens, even as against Andrew D. Lewis's heirs, and, of course, not as against his coparceners.

But these considerations do not meet the question as to all the parties touching this order of reference; for we are not to forget that it was a consent-order, consented to by Sperry for said infants, and by an attorney for Lewis's heirs. Could the guardian make this suit of Carr or his own suit a proceeding to ascertain debts against Andrew D. Lewis? I think not. A guardian, under our statute, has not the power even to defend suits against his wards; for infants defend by guardian *ad litem*. The guardian *ad litem* did not consent, if he could have done so. Even the answer of a guardian *ad litem* can not be read as evidence against the infant, and no admissions by him bind the infant. Bart. Ch. Pr. 402; Bing. Inf. 33; *Bank* v. *Patton*, 1 Rob. (Va.) 500; *Crotty* v. *Eagle's Adm'r*, 35 W. Va. 143 (13 S. E. Rep. 59); Ewell, Lead. Cas. 235. Acts beneficial to an infant, though unauthorized, are adopted and ratified by the law; but when, as here, they are to his prejudice, it is otherwise.

I can not think that the guardian could thus make a suit, which *quoad hoc* was no suit at all, perform the functions of a regular suit to convene liens of the infants' father, and thus prejudice their estate. It is not a question of an infant showing cause against a decree that has force, but it is a question of the inherent inefficacy or invalidity of a decree. But, as to the adult heirs, I think their consent to this reference rendered the suit efficient as against them, and made the order of reference perform the usual function of the convention of liens in a suit properly brought for the purpose. They consented to use this proceeding to adjudicate liens claimed to exist, or appearing to exist, on their lands. They, at the same time, answered the bill of Sperry asking a sale of the land, and consented to the reference in both suits. They did so in order that a sale for a large price

might be effected, which could not be done until such clouds should be removed; and now to permit such adult parties to deny the effect of a consent-order made for their benefit, would be to nullify the effect of solemn consent, which, when made by parties competent, is very potent in law. These adult heirs again consented to a reference, June 27, 1872, to ascertain liens created by them on the land; thus again and still agreeing to make the suit a means of passing on that matter. So I conclude that, as to the adult heirs of John Lewis these orders of reference are valid, and that the statute of limitations stopped as to liens against them December 19, 1865, but not so as to the infant children of Andrew D. Lewis.

But, though these be valid orders of reference, they did not operate to make void judgments liens on the lands. The question now arises for solution: What was the effect of the order of October 15, 1866, confirming Polsley's report, which found some of these rejected judgments valid liens upon the land of Andrew D. Lewis and John W. Lewis? Though themselves void, did this order validate them, and is the question of their validity *res adjudicata?* I think not, and this for two reasons:

(1) The order simply and only confirmed the report, and did not go on to adjudicate and decree that the debts were liens, or that they be paid, or that, unless paid, the land be sold, or that the debts named in the report be paid. Would any commissioner having in his hands money derived from land pay on those debts without further order? Would any one be warranted in paying debts under it? I should think not—the order wanted completion and finality.

(2) The court afterwards annulled this order on petitions filed for the purpose. If it were a final decree or an appealable decree, the order setting it aside would be improper, because too late. What is its character? Decrees are interlocutory or final. Under chancery practice, unaffected by statute, an interlocutory decree may be set aside in some cases on mere motion; in others, by petition for re-hearing —the distinction between cases where it can be done by motion and where it must be by petition not being clearly

defined. Bart. Ch. Pr. 126; Chancellor TAYLOR'S opinion in *Banks* v. *Anderson*, 2 Hen. & M. 20; Sand. Eq. 690.

In *Hyman* v. *Smith*, 10 W. Va. 298, it is held that an interlocutory decree may be reversed without a bill in nature of a bill of review, if there is sufficient matter to reverse it on the face of the record; but that the new investigation is usually brought on by petition for rehearing when there is no defect to be supplied. This distinction is unimportant here, as petitions for rehearing were filed. But our statute gives some decrees which are in nature interlocutory, under the principles of chancery practice, the quality of finality by making them appealable. *Core* v. *Strickler*, 24 W. Va. 693. Such are decrees adjudicating the principles of the cause. If this decree (to call it a decree and not a mere order) be an appealable decree, then it could be reversed only on appeal or bill of review, both of which were barred when the petitions to reverse the decree were filed, in 1885; but if it be not an appealable decree, being interlocutory in nature, the petition for rehearing was not barred, for there exists no statute limiting a petition for rehearing to an interlocutory decree. Bart. Ch. Pr. 126; *Kendrick* v. *Whitney*, 28 Gratt. 646; *Cocke* v. *Gilpin*, 1 Rob. (Va.) 21. It surely can not be a final decree in its nature, unaffected by the statute making some interlocutory decrees appealable. It is difficult to define accurately a final decree; but I do not think it difficult to decide that this decree is not final, for it is incomplete, and leaves much yet to be done in the case.

As said by Judge GREEN in *Gillespie* v. *Bailey*, 12 W. Va. 80, it is generally conceded that what Judge BALDWIN said in *Cocke* v. *Gilpin*, 1 Rob. (Va.) 28, is true, viz: "Where the further action of the court in the cause is necessary to give the complete relief contemplated by the court, then the decree upon which the question arises is to be regarded not as final, but interlocutory. I say further action in the cause, to distinguish it from that action of the court which is common to both final and interlocutory decrees, to wit, those measures necessary for the execution of the decree, and which are properly to be regarded as adopted, not in, but beyond, the cause, and as founded on the decree

itself, or mandate of the court, without respect to the relief to which the party was originally entitled."

See collection of Virginia cases, as to what are final and interlocutory decrees, in *Manion* v. *Fahy*, 11 W. Va. 493.

So I hold that this order of 15th October, 1866, is not, outside our statute, a final decree. Then is it an appealable decree, though in essential nature interlocutory, under our statute, which gives an appeal from a decree adjudicating the principles of the cause? I am of the opinion that it is not, and for the reason that to be such a decree it must adjudicate all questions raised in the cause by pleadings or otherwise. *Shirey* v. *Musgrave*, 29 W. Va. 131 (11 S. E. Rep. 914); *Kill* v. *Als*, 27 W. Va. 215.

But suppose I am wrong in regarding the order of October 15, 1866, as not final in its nature and non-appealable; but that it is an appealable decree. Then, also, are the two decrees of the 14th and 15th of July, 1885, reversing that order, appealable decrees, and appeal from or bill of review to them is barred; and they being appealable decrees, and an appeal from them barred, this appeal from the decree of July 1, 1890, would not bring them up to be considered with the last decree, and we could not review those decrees. *Hoy* v. *Hughes*, 27 W. Va. 778; *Lloyd* v. *Kyle*, 26 W. Va. 534.

So in fact, whether right or wrong, there stand those two decrees in July, 1885, reversing and vacating said decree of October 15, 1886; and they are not nullities, even if erroneous, but, in legal effect, reverse and vacate that decree, and it has no longer any operation; for a reversed or vacated decree does not constitute an estoppel—on it no plea of *res adjudicata* can rest. 2 Black. Judgm. § 511; Freem. Judgm. § 333.

Thus I reach the conclusion that said decrees do not validate said judgment, or estop the judgment-debtors from assailing them, and I concur with the circuit court in disallowing them as liens.

Now, as to the judgment of Sarah E. Lewis against Andrew D. and John W. Lewis for six hundred dollars, reported as a lien by the commissioner, but rejected by the court. It is a valid judgment, as the defendants appeared

by demurrer and plea in the action in which it was rendered; but, so far as it concerns Andrew D. Lewis, as the order of reference of 1865 did not operate as to his infant children, it is barred; but, as it did operate to stop the statute as to John W. Lewis, it is not barred as to him. The only execution on it was returnable at March rules, 1858.

The other judgments against Andrew D. Lewis rejected by the court are for same reason barred. The reference was made in the Carr suit and the Sperry suit. Of course, the Carr suit was not such a suit as *per se* to stop the statute from its commencement as to debts of the heirs, though it might have had that effect as to debts of John Lewis. The Carr suit was brought in 1861. The administrator and other heirs of John Lewis filed an answer; but, as Andrew was dead when it was filed, his name is not mentioned in it. His heirs were never made parties to it, by renewal or otherwise. Their presence as parties to the Sperry suit would not make them parties to the other suit. Even if their consent by guardian could make them parties, their presence as parties would be unavailing to render the reference valid, there being nothing in either bill as to debts of their father. We find no error in this appeal, except in the rejection of Sarah E. Lewis's judgment for six hundred dollars.

### JOHN W. LEWIS'S APPEAL.

It is urged against the right acquired by Nicholas Fitzhugh to the interest of John W. Lewis in the Bull Creek land, by the sale under the deed of trust from Lewis, that that sale was made April 5, 1869, and that the proceeding must have conformed to the Virginia Code (Ed. 1860, c. 117, § 6) and not to §§ 6, 7, c. 72, Code 1868. It is not specifically pointed out wherein there was a departure from the Code of 1868, but I presume that it was as to notice of sale. Both Codes required a cash-sale; neither prescribed a place. It is to be presumed that the trustee conformed to law except wherein it appears he did not. *Lallance* v. *Fisher*, 29 W. Va. 512 (2 S. E. Rep. 775). The deed of trustee recites that the sale was made "after due publication of time, place, and terms of sale for four successive

weeks in the West Virginia Journal, a newspaper pub- lished in Kanawha county." The Code of Virginia re- quired the sale to be after "having first given reasonable notice of the time and place of sale," leaving it to the trus- tee to determine what was reasonable notice, under a sound discretion; and we think this notice a reasonable and fair notice.

But the code of 1868 required notice to be posted thirty days before sale on the front door of the court-house of the county wherein the land lies, and at three other public places in the county, one near the premises, and a copy served on the grantor, and the notice to contain particular elements. The notice here does not conform to that Code. But which Code governs? Serious question could be made whether the Code of 1868 would be valid as to prior deeds of trust, if it had expressly applied itself to them; because a deed of trust or mortgage is a contract, and the law in force when it is made forms a part of it. Wade, Retro. Laws, § 118. In *Taylor* v. *Sterns,* 18 Gratt. 244, it was held that a statute staying collection of debts for a limited time was unconstitutional as to prior deeds of trust.

I know that it will be said that this change is only as to the remedy or mode of procedure, and that the legislature is able to modify remedies, so it leave a reasonable and ade- quate one. Certainly this is and ought to be true as to judicial remedies; but where, as in a deed of trust, the remedy is stipulated or agreed, it is a more serious question. If the deed itself provided certain notice of sale, a new statute could not add a more burdensome procedure, or one causing substantial delay. But it is not necessary to decide this, for several reasons.

Laws, though relating to remedy, are presumed to operate *in futuro,* unless plainly intended to act retrospectively. 1 Tuck. Com. Laws, 3; *Stewart* v. *Vandervort* (12 S. E. Rep. 736) 34 W. Va. 524; Wade, Retro. Laws, § 298. Again, the Code of 1868 went into operation April 1, 1869, and this sale was made April 5th. Now, the publication of sale notice was nearly, likely quite completed before the Code. Certainly three weeks' publication had been made, and we can not say that was not reasonable notice. But even if,

as the trustee decided four weeks' publication to be reasonable, we say that period was requisite, we can say that it is not shown that there was not four weeks' publication before April 1st. Here, then, is a publication finished before the new Code—a legal proceeding which had already worked its effect under the law then in force, and had accomplished that part of the sale proceeding or steps consisting of notice before the 1st April, and the balance of the proceedings—the sale, its terms, conveyance, and report—were not different under the two Codes. Why shall we say that such publication, thus complete before April 1st, is abortive?

Moreover, the Code of 1868, in chapter 166, §§ 1, 2, after providing that it should go into force 1st April, 1869, and that all laws in force, of a general nature, on the preceding day, should stand repealed, provided that such repeal, except when otherwise in that Code provided, should "not affect any act done * * * or any right established" before the 1st April, save only that proceedings thereafter had should conform, as far as practicable, to that Code. I think this would save, of itself, the act done in the completed publication.

Another argument against this sale is that it was made when incumbrances hung over the property. At its date a cloud of incumbrances impended over it. There was the suit of the Fowlers against John Lewis's heirs, in which an attachment for a large amount had been issued for a debt of John W. Lewis's father; there was the pending suit of Carr to subject the land to a debt of the father; and there were those judgments against John W. Lewis, which were docketed, and which were ordered to be convened by an order of reference for enforcement against this land in the Carr suit; and there was the suit of Mrs. Kenna to participate in the land, and lessen John W. Lewis's share. Under these grave and heavy clouds lowering over the land, and depreciating the value of the property, had John W. Lewis sought in time to set aside said sale, I have no doubt he would have succeeded, under principles found in 2 Tuck. Com. Laws, 106; *Rossett* v. *Fisher*, 11 Gratt. 492; opinion, *Spencer* v. *Lee*, page 188 of 19 W. Va., citing many authorities.

Gross inadequacy of price is urged as a ground to invalidate the sale; but, under the clouds over the land threatening it with subjection to very large amounts of money, it is difficult to say that, as things then were, the price was inadequate.    But John W. Lewis took no steps to vacate the sale for non-conformity of the sale to the Code of 1868, or inadequacy of price, or because of clouds on the land, until July 15, 1885, more than fifteen years after the sale, and after Fitzhugh had given deeds of trust on the land.    This long acquiescence, this laches, will defeat his claim to overthrow the sale.    It is not a question of possession, as suggested by counsel, but of acquiescence and laches.    *Vigilantibus non dormientibus jura subveniunt,* is a favorite rule of equity.    Nothing calls it into activity but good conscience, good faith and reasonable diligence.    Where these are wanting, the court is passive, especially when rights of third parties may be prejudiced. 1 Bart. Ch. Pr. 90; *Trader* v. *Jarvis,* 23 W. Va. 100; *Connell* v. *Connell,* 32 W. Va. 319 (9 S. E. Rep. 252).    Equity has always refused its aid to stale demands, wholly independent of statutory provision, where the party has slept upon his rights and acquiesced for a great length of time.    Nothing can call a court of equity into activity but conscience, good faith and reasonable diligence.    1 Pom. Eq. Jur. §§ 418, 419.    So strong is this principle that it overcomes that favorite maxim of equity, "Equity will not suffer a wrong without a remedy," (1 Pom. Eq. Jur. § 424) and under it an equity otherwise superior will be postponed to a subsequent interest acquired by another (2 Pom. Eq. Jur. § 687).

In *Dryden* v. *Stephens,* 19 W. Va. 1, it was held that, where a purchaser under a deed of trust has sold to an innocent party, the sale can not be set aside because the sale was for a grossly inadequate price, and that where a party waited four years before suing to set it aside for want of advertisement, and an innocent purchaser was involved, it can not be set aside.    See *Whittaker* v. *Improvement Co.,* 34 W. Va. 217 (12 S. E. Rep. 507) and cases cited as to laches.

No fraud, concealment or obstruction is shown to excuse this laches, and such excuse must be shown.    *Wagner* v. *Baird,* 7 How. 234.    Fitzhugh did not become a party to

this suit until July 15, 1885, and could not be affected by it, because there was in the pleadings no allegation or denial of his right. The mere fact, that Polsley reported his deed of trust as a lien, neither he nor his trustee being a party, could not affect him, *Bilmyer* v. *Sherman*, 23 W. Va. 656, and for the additional reason that the suit was not, for reasons above stated, such as to affect his rights by a reference. Ashby and wife did file a bill, now lost, which appears to have been an attack on Fitzhugh's right, but it was dismissed on demurrer, 22d of November, 1871, and a bill of review to the decree of dismissal was dismissed July 1, 1885, and the decree of 22d of November, 1876, reaffirmed, and appeal from both is barred. But this reference to Ashby's suit is useless, as he is not appealing, and it can not help John W. Lewis.

It is scarcely worth while to say that the injunction by Cochran, administrator, to enjoin Fitzhugh from selling as commissioner the Bull Creek land under decree in the Carr case, and which was dismissed, could not make Fitzhugh a party to the Carr suit, because it was against him only in his character as commissioner; and for a person to be considered a party to a suit, or be bound by a decree in it, he must have been before the court in that capacity in which he is sought to be bound. Black, Judgm. § 536; Freem. Judgm. § 156. Fitzhugh, special commissioner, is not Fitzhugh, the individual, in his own right; and Cochran was a foreign administrator, not entitled to sue.

The claim that Lewis was a Confederate soldier is unavailing. Chapter 28, Acts 1872–73, would exclude only less than two years; and the pleading setting up that fact is not verified; and anyhow, if Lewis could not take the suitor's oath, it is not proven or alleged that Fitzhugh could take it, and, if he could not, he could not have required it of Lewis, and the statute of 1872–73 would not apply.

It is contended that, as Fitzhugh was attorney for John W. Lewis, his purchase is invalid. If he was attorney for Lewis in defending his interest in this suit, it would not preclude his buying; but he was never attorney for John W. Lewis in this suit. The fee for which the deed of trust was given was in a wholly distinct matter, unconnected with this land. Nor was he attorney in this litigation in defence

of John Lewis's estate, as shown by John Slack, its administrator, in his deposition. So I see no reason to overthrow the Fitzhugh purchase at this late day. But I remark that the judgment of Sarah E Lewis against Andrew D. Lewis and John W. Lewis for six hundred dollars with interest and costs, takes precedence over Fitzhugh as to John W. Lewis's share in the proceeds of the land, because that judgment is older in date, and was docketed in Boone before Fitzhugh's deed of trust was recorded there.

APPEAL OF JAMES V. AND SARAH E. LEWIS.

Thomas L. Broun filed his petition with Commissioner Ruffner while executing an order of reference to ascertain liens on lands of James V. Lewis and others, claiming the whole of James V. Lewis's share in the Bull Creek land, and a judgment in favor of James V. Lewis against John W. Lewis, and a claim against Margery Ashby by conveyance from James V. Lewis. The petition made no person defendant, asked no process, and yet proposed to have decreed to Broun large property interests of James V. Lewis, which, on the face of the record, as it was before the presentation of the petition, would be decreed to Lewis.

A petition can only be filed by leave of court, and an opportunity must be given to any party in interest to answer it. All petitions, except those which are of course, require service on all parties interested. Bart. Ch. Pr. 343; *Walter* v. *Chichester*, 84 Va. 723 (6 S. E. Rep. 1).

Here is a stranger to the record coming in with new matter, asking, in effect, a decree against a defendant, or to be substituted to his right. Such an order is not one of course. It asks to have assigned to Broun real estate of James V. Lewis. If any petition would require process or give right to defence, this would. But Lewis and wife appeared to this petition, and filed an answer, which was afterwards struck out, and they were refused the privilege of defending it. It is true, they were allowed to file a petition in the nature of an original bill, contesting Broun's right; but the court went on to decree to Broun under his petition all rights he claimed in it. Surely, if it could be used, as it was, to introduce facts on which James V. Lewis's rights were diverted from him to Broun, Lewis

ought to have been allowed to make defence to it. It seems to me that this was taking a man's property by judicial action without giving him a day in court or opportunity to be heard, and that the error is more signal in the fact that Lewis asked to be heard, and had filed a defence to the petition, which was struck out. This is error.

The United States Supreme Court has said that if a man be assailed in court he has a right to defend. The liability and right are inseparable. And where an answer of a party defending was struck out, the court said, and it could not hesitate on the question, that a judicial sentence under such circumstances would be contrary to first principles of the social compact and the administration of justice. *Veigh* v. *U. S.*, 11 Wall. 267. And the Virginia Supreme Court, where there was a decree after answer stricken out and a refusal to allow a defence, held the decree a nullity. *Underwood* v. *McVeigh*, 23 Gratt. 409. The right to defend when sued was said by CHIEF JUSTICE MARSHALL in *The Mary*, 9 Cranch 144, to be "a maxim of natural justice and universal application." Of course, this does not mean that a court can not rule out an insufficient pleading.

We have not this answer of Lewis in the record; but there is an order, after the answer was struck out, refusing him leave to become a defendant to Broun's petition. I must not omit to say, and I take pleasure in saying, that the judge of the Circuit Court intended no denial of justice to Lewis, and acted from pure motives. He simply meant, as I suppose, that Lewis could not in that mode assail the deed from Lewis to Broun, but must do so in a more formal manner, and allowed Lewis to file a pleading, called in the record "a petition in the nature of an original bill," which may have been proper. But why go on, and decree Broun, on his petition, all he asks therein? On this new pleading, filed by Lewis against Broun, a litigation took place between them, and the court held that Lewis was not entitled to annul said deed to Broun, and dismissed his bill. Lewis at once took an appeal to this Court, and that appeal is now pending here.*

---

*Since this opinion was handed down and pending the rehearing of this case *Lewis* v. *Broun*, has been decided and is reported *supra*, p. 1. (14 S. E. Rep. 444.)—(REPORTER.)

After said appeal was taken, and the whole matter between James V. Lewis and wife was pending in this Court, the court below rendered the decree declaring Broun entitled to all the share of James V. Lewis in the proceeds of the sale of the Bull Creek land, and the debts assigned by Lewis and wife to Broun. We think it was error to decree thereon, for the bill dismissed and the decree of dismissal were part of the record in this case, and called for a suspension of action on the branch of the case as between James V. Lewis and wife and Broun.

We say nothing—decide nothing—on the merits as between James V. Lewis and wife and Broun, because they are involved in said appeal, which remains to be decided by this Court; and this decision is without prejudice to Broun's rights therein. We simply decide that it was erroneous to decree as the court did between James V. Lewis and wife and Broun on Broun's petition, without allowing a defence to it, and while the controversy between them was pending on appeal in this Court.

Perhaps it was thought that, if the decree should on such appeal be reversed, it would virtually reverse the decree of July 2d, now complained of. This can not be so. That decree and the decree of April 8, 1890, are separate. If the latter should be reversed, there would stand the decree of July 2, 1890, from which the appeal now in hand was taken, and it would require an appeal to reverse it.

We think the decree of July 2, 1890, as between James V. Lewis and wife and Thomas L. Broun, is erroneous.

### JOHN S. SWANN'S APPEAL.

In this appeal the first question which occurs is : Has the appellant Swann any lien upon the fund coming from the sale of the Bull Creek land, or the land itself, upon his own showing ? Let us see what were the services as attorney at law on which he predicates this lien.

John Lewis died owning personal and real estate, including this Bull Creek land, having made a will giving his estate to his three sons, John W., Andrew D., and James V. Lewis. A daughter, then Mrs. Margery Kenna, later Mrs. Margery Ashby, brought a suit to invalidate the will, or at least to obtain full participation in her father's

estate ; and she succeeded in obtaining a decree admitting her to participation in the personalty, but not in the land ; but, as likely further litigation was threatened, a compromise between her and her brothers gave her a full share with them in the Bull Creek land. Swann claims for services in defence of this suit for the other heirs, and that his claim is a lien on the money coming from the sale of the Bull Creek land.

Another claim is this : Joab and Thomas Fowler, as children of Thomas Fowler, sued John Lewis's heirs and administrator in 1858, claiming that their father and John Lewis were joint owners of certain lands held by Lewis in trust for his benefit and Fowler's benefit, and that Lewis had sold and received the proceeds of much of it, and had not accounted to Fowler for his part, and yet owned some land in which Fowler had a share ; and they sought to render Lewis's estate accountable for moneys thus received, and to secure a share in land yet unsold, and an attachment in the case was likely a lien on this Bull Creek land. A large sum against Lewis's estate was reported by a commissioner, but by compromise a decree subjecting it to the payment of seven thousand five hundred dollars was made in October, 1867. Swann claims for services in defence of this suit, and says his demand is a lien on the proceeds of said land.

The third claim of Swann is this : Carr brought a suit against Lewis's administrator and heirs to subject the personal and real assets of Lewis to payment of a judgment against Lewis's administrator in favor of Carr. This judgment was established against Lewis's estate, as also some other debts. Swann claims for defending this suit, and says his claim is a lien on the proceeds of sale of the said land.

It is very well settled that an attorney has, under circumstances, a lien for his services. This lien is of two kinds : What is called the attorney's "retaining lien"—a right to retain papers or property in his possession or moneys collected for payment of a general balance due him for services. This lien has no relation to this case, as no money was collected by Swann. It has also been held that

an attorney may have a special lien upon a fund in court or in the hands of a receiver, recovered by him; and a court of equity, having such a fund in its possession, will protect the attorney in retaining out of it a reasonable compensation for his services. Jones, Liens, §§ 147, 148; *Olds* v. *Tucker*, 35 Ohio St. 581; *Spencer's Appeal* (Pa. Sup.) 9 Atl. Rep. 523; *McKelvey's Appeal*, 108 Pa. St. 615.

But note that in these cases the attorney's fee was for recovering the money constituting the fund. And note, further, that where the money is not in possession of the attorney, but in the hands of the court, his lien is not a general one for balance due for services generally, but only for services in the proceeding which produced the fund.

But there is another lien of an attorney, existing when he has neither money nor property in his hands, nor is it in the hands of a court, and it is defined as follows in the case of *Renick* v. *Ludington*, 16 W. Va. 378: "An attorney has a lien on the judgment or decree obtained by him for his client for services and disbursements in the case, whether the amount of his compensation is agreed upon or depends upon a *quantum meruit*."

1 Jones, Liens, § 153, discussing this lien, says: "The lien of an attorney upon a judgment is properly denominated a lien in the broad sense of the term, though it rests merely on the equity of the attorney to be paid his fees and disbursements out of the judgment which he has obtained. It is not a lien that depends on possession, as liens ordinarily do, for this exists only in intendment of law. The execution on a judgment does not represent the judgment, and possession of the execution is not possession of the judgment. * * * This lien, therefore, not arising from a right on the part of the attorney to retain something in his possession, but being a right to recover for his services in obtaining judgment for his client, is called the attorney's 'charging lien.' It is so called because the costs and fees of the attorney are made a charge upon the judgment recovered, and this charge is enforced by the court. Some confusion has arisen in the decisions on this subject from a failure to observe the distinction between the retaining and the charging lien. The latter never extends beyond the

costs and fees due the attorney in the suit in which the judgment is recovered; but a retaining lien extends to the general balance due the attorney from the client for professional services, and his disbursements in connection therewith. In other words, the charging lien is a special lien, and the retaining lien is a general lien."

I see no place which the appellant's demand can hold under these definitions. In Judge GREEN's discussion of the nature and extent of an attorney's lien in *Renick* v. *Ludington*, 16 W. Va. 378, he speaks of the lien as existing upon a judgment, only where it is recovered by means of the service of the attorney in favor of his client. I have examined the elaborate discussion of the subject of attorney's liens in that valuable work, Jones on Liens, and very many of the cases there and elsewhere cited, particularly the elaborate discussion of the subject found in *Stewart* v. *Flowers*, 44 Miss. 513 (7 Amer. Rep. 707) and *In re Wilson*, 12 Fed. Rep. 235; and nowhere have I found that this charging lien in favor of an attorney exists except as to moneys in the hands of a court, which his services secured, or judgments or decrees recovered by him for his client. Nowhere have I found that a claim of lien for services defensive purely has been sustained. To sustain such a lien there must be an affirmative recovery, and then the attorney is paid out of the thing recovered. It may be that services of an attorney in defence of an action against an estate are very valuable in preserving the assets of that estate, but there is no lien therefor. What the estate retains against unfounded claim against it it already had; it simply keeps it by reason of successful defence against assault; but it has recovered nothing.

Again, this claim is for defending claims against the land, and the lien demanded is against the land or its proceeds. In fact, there is no other fund to pay it. Would it be thought that an attorney has a lien for his fee on land recovered by him for his client in ejectment or other proceeding, much less in successfully defending such a suit? Several cases have held that neither for recovering nor defending land has an attorney a lien on it.

In *Lee* v. *Winston*, 68 Ala. 402, it was held that an attor-

ney has no lien on his client's lands for services rendered in defending them against an effort to charge them with payment of a debt. After saying that an attorney has a lien on a judgment recovered, the court said : "But the present was not a case of judgment recovered, payable in money, which, when collected, may, and ordinarily does, pass through the hands of the attorney. It arose out of a defensive proceeding, which protected Mrs. Lee's lands against an attempt to charge them with a debt. We hold the attorney acquired no lien on the lands."

In *McCollough* v. *Flournoy,* 69 Ala. 189, the court said : "The single question this case presents—whether a solicitor, successfully prosecuting a suit in equity to establish the title of his client to real estate, has a lien on the estate for his fees—was decided in *Hinson* v. *Gamble,* 65 Ala. 605." The existence of such lien is recognized in Tennessee, but is repudiated in other states. *Hunt* v. *McClanahan,* 1 Heisk. 503 ; *Brown* v. *Bigley,* 3 Tenn. Ch'y 618 ; *Humphrey* v. *Browning,* 46 Ill. 476 ; *Smalley* v. *Clark,* 22 Vt. 598 ; *Cozzens* v. *Whitney,* 3 R. I. 79 ; *Hanger* v. *Fowler,* 20 Ark. 667.

It seems to us unwarranted by principle to extend the lien to lands which have been the subject of suit. There would be much difficulty and confusion resulting from it, embarrassing alienation it is the policy of the law to unfetter. See *Humphrey* v. *Browning,* 95 Am. Dec. 446, holding that the attorney has no lien for recovering land in ejectment or other action. Likewise *Martin* v. *Harrington,* 57 Miss. 208 ; *Hanger* v. *Fowler,* 20 Ark. 667 ; *Smalley* v. *Clark,* 22 Vt. 598.

There is another obstacle to the appellant's demand. "An attorney's lien upon an uncollected judgment is confined to the judgment in the very action in which the services were rendered. The theory upon which the lien is founded is that the attorney, by his skill and labor, obtained the judgment, and hence should have a lien upon it for his compensation, in analogy to the lien which a mechanic has upon an article which he manufactures." 1 Jones, Liens, § 166 ; *Adams* v. *Fox,* 40 Barb. 448 ; *In re Wilson,* 12 Fed. Rep. 235. He can not charge on one judgment fees in several cases.

In this case the fund which the attorney seeks to make

liable comes from sale in the case formerly under the title
of *Carr* v. *Administrator and Heirs of John Lewis*, later
under the title of *E. M. Fowler* v. *Administrator and Heirs
of John Lewis*, from a sale of the Bull Creek land, to pay
debts of John Lewis, and by the reference to pay debts of
heirs and at suit of Sperry, guardian of Andrew D. Lewis's
children. Now, what claim can Swann have on the land
or its proceeds for services in an entirely different suit
brought by Mrs. Kenna to overthrow her father's will and
come in for a full share of her father's estate? What claim
can he have for service in defence of the suit long ago dis-
missed, wholly different from the suit now entitled *E. M.
Fowler* v. *Administrator and Heirs of John Lewis*, brought
to set up Fowler's demand against Lewis's estate? What
claim can he have for defence by answer for heirs of John
Lewis of Carr's suit to subject John Lewis's land to pay a
debt of Carr's which was established and paid long ago
during the pendency of the suit from personal assets?

Without passing on the question of the authority of the
person employing Swann, or what services he rendered, or
the value of his services, or for whom the services were
rendered, or on the question of limitation, we are com-
pelled to decide that he has no lien for his fees, and we
think the commissioner and Circuit Court decided cor-
rectly as to this matter, and we affirm the decree in this
respect, without prejudice to any personal action.

ON REHEARING.

BRANNON, J:

Since the foregoing opinion was delivered in the Appeal
of John S. Swann, a rehearing was granted him, and upon
the decision after such rehearing I add the following to
the above opinion:

As to the position taken in the foregoing opinion that
an attorney's lien does not extend to land: A statute of
Louisiana gave attorneys a lien for fees "on all judgments
obtained by them," and it was held in *Luncau* v. *Edwards*,
39 La. Ann. 876 (6 South. Rep. 24) that it did not create a
lien on land recovered, and in *Weil* v. *Levi*, 40 La. Ann.
135 (3 South. Rep. 559) that it did not create a lien on land

successfully defended. In *Fillmore* v. *Wells*, 10 Col. 231 (15 Pac. Rep. 343) the lien was declared to extend to realty recovered, but the decision was based expressly on a statute; and the opinion in the case admits that it could not be sustained by the common-law, saying: "There are few decisions which seem to sustain the attorney's right to look, through his lien, to the land for his taxable fees; but the weight of authority undoubtedly sanctions the proposition that no such privilege is awarded by the common-law."

After the decision in Arkansas in *Hunger* v. *Fowler*, cited in the above opinion, holding that an attorney had no lien on land recovered, the legislature of Arkansas enacted that attorneys should have a lien upon and an interest in "any judgment recovered by or in favor of a party" for their fees, and that, where the judgment was for real or personal property, "the lien should amount to an interest in such property;" and it was held in the late case of *Hershy* v. *Du· Val*, 47 Ark. 86 (14 S. W. Rep. 469) that "a solicitor has no lien upon his client's land for his fee for services rendered in removing a cloud from his title to it;" that the lien provided by said act "is limited to cases where there has been an actual recovery, and can not be extended to services which merely protect an existing title or right of property." The court declared that, without a statute to authorize it, attorneys can not sustain a claim against real estate for services in either prosecuting or defending a suit involving it. The House of Lords in 1858 held that an attorney has no·lien upon an estate recovered for a client, but only on papers in his hands, and overruled the case of *Barnesley* v. *Powell*, Amb. 102, holding that a solicitor prosecuting a chancery suit has a lien on the estate in the hands of the party recovering. Lord WENSLEYDALE (Baron PARKE) said, "I never heard such a proposition at law." "Nor I in equity," said Lord ST. LEONARDS (formerly Sugden, the author of Sugden on Vendors.) The decision of the House of Lords gave rise to the English act (23 & 24 Vict.) providing that the court may declare a lien on property recovered or preserved in the suit for the services of the attorney. Why this statute, if, as claimed here, there was a lien without it?

Kentucky has a statute providing that an attorney prosecuting to recovery an action for property real or personal shall have a lien on it for his fee, and the Court of Appeals of that State held that, "where nothing is recovered for his client, there is nothing to which an attorney's lien can attach." *Wilson* v. *House*, 10 Bush, 406

The appellant's claim is for services only defensive of the land against a debt claim, and it seems to me that the cases above cited repel such claim. It is further strongly repelled as a claim for services in defence of a debt sought to be asserted against it by the case in Tennessee, of *Garner* v. *Garner*, 1 Lea 29, wherein the syllabus reads: "The solicitor of the defendants, in a suit to establish a resulting trust in the client's land, is not entitled to a lien on the land for compensation due him for professional services, although the suit be successfully defended." Also by the case of *Hinson* v. *Gamble*, 65 Ala. 605, holding that "an attorney has no lien on lands for professional services rendered for the owner in a suit which sought to subject them to an unfounded claim or liability."

I shall now refer to some of the cases cited by appellant on his application for rehearing. Great stress is laid upon the Tennessee case of *Hunt* v. *McClanahan*, 1 Heisk. 503, holding that attorneys have a lien upon property recovered or preserved, which may be declared by order in the cause in which the services were rendered. That was a suit brought to enjoin the sale of land under a judgment, and on petition filed in the same case at the same term at which the decree exonerating the land from the judgment was rendered, asking compensation to the attorneys of complainants for the services, a lien was declared against the land. That lien was declared on petition in the same case, and the court regarded it as a pecuniary fund in the hands of the court, as the opinion states. The syllabus, it is noted, announces that the attorney has a lien which may be declared by an order in the cause in which the services are rendered. But that case was decided in 1870; and in the case of *Garner* v. *Garner*, above cited, decided in 1878, the same court held that the defendant's solicitor has no lien for service in successful defence of a suit to establish a re-

sulting trust upon land; the court saying in the opinion that the court had recently considered the question in several unreported cases, and reached the conclusion "that the lien only exists in the case of the actual recovery of land by a suit instituted for the purpose, just as at common-law the lien was on the money-judgment recovered;" and added that the "safer rule would be to hold that the lien can not be extended to services which merely protect an existing title or right to property." The court said that the "language used in some of the cases would seem to justify such extension of the rule," but added that the court had recently considered the question, and reached the conclusion above stated.

Perhaps the former case of *Hunt* v. *McClanahan*, 1 Heisk. 503, was referred to as using language to justify such an extension of the rule, and that, weighed in the balance, it had been found wanting. It would seem so. It is not followed in the later case, but impliedly overruled; and that case was based on *Barnesley* v. *Powell*, Amb. 102, but, as stated above, the last-named case was overruled in the House of Lords.

Great stress is also laid on the Georgia case of *Strohecker* v. *Irvine*, 76 Ga. 639, holding that "the lien of an attorney for services in successfully resisting a levy on a homestead and obtaining it to be set apart as an exemption is in the nature of labor done on the homestead and of purchase money thereof, and the homestead is subject thereto." This case is not an exposition of common-law doctrine, for section 1989 of the Georgia Code, expressly provides that attorneys' services shall be a lien on land. Nothing more need be said of that case.

The case of *Cowdrey* v. *Railroad Co.*, 93 U. S. 352, was a a claim for attorney's fees upon money arising from a mortgage which he had been employed to enforce; an ordinary case of attorney's lien as to a debt he recovers.

*Winchester* v. *Heiskell*, 119 U. S. 450 (7 Sup. Ct. Rep. 281) is clearly not applicable. An attorney was employed to defend in a state court a suit to set aside a deed of land. Pending the suit, the party retaining him conveyed the land in trust to secure debts, and became a bankrupt. The attor-

ney succeeded in defending the land, and in the suit sustaining his client's right the assignee became a party, and a lien was declared in favor of the attorney, and the land sold for it. Then the parties claiming under the trust-deed sued to enforce their lien, claiming their right to be superior to that of the purchaser under the decree made for the attorney's lien, and claiming that they were not bound by said decree, as they nor their interest in the land had been before the court in the former suit; and this suit was dismissed, the state court holding the decree in the first suit binding. There the court pointedly said that while, under earlier decisions (*Hunt* v. *McClanahan*) a lien could have been sustained for defending a suit to recover land, yet, under later decisions (*Garner* v. *Garner*, 1 Lea 29) no such lien could be sustained. 16 Lea 556.

The case went to the United States Supreme Court. The sole questions were, not whether the court in the first suit had properly decided that the attorney had a lien, but, first, whether there was federal jurisdiction to enable the Supreme Court to render any decision; and, if so, whether the state court had jurisdiction to render a decree allowing the lien, or was without jurisdiction, because the matter touched the estate of a bankrupt, of which the federal tribunals had jurisdiction. The Supreme Court only held (1) that the state court had jurisdiction to bind those who were parties and those whom they represented; (2) that, the assignee having appeared and litigated the matter, he and those he represented were bound by the decree. The Chief Justice said that immunity from the decree was claimed because the bankrupt act made the jurisdiction of the United States courts exclusive in such cases, and said: "We thus have jurisdiction, but, as the decision of the state court upon this question was clearly right," no further argument was desired; that is, the decision of the state court that the state court had jurisdiction in the suit in which the decree allowing the lien had been given was right. The merits of that decision were not at all considered; simply that the state court had jurisdiction to issue the decree, and that it was conclusive.

The case of *Trustees* v. *Greenough*, 105 U. S. 527, has no

application, for it involved no question of attorney's lien, but simply held that, where one bondholder, suing for himself and others, had by suit obtained a decree selling land conveyed to trustees to secure the bonds, he should be reimbursed costs paid by him, some of them being fees paid by him to attorneys in litigation to save the property from waste. He was reimbursed costs, as if a trustee. The court said so, and that a trust-estate must bear the expenses of its administration.

The case of *Railroad Co.* v. *Pettus,* 113 U. S. 116 (5 Sup. Ct. Rep. 387) is simply the assertion of a claim by attorneys prosecuting suit to collect a debt by foreclosing a mortgage, and is nothing more than the application of the common doctrine that an attorney has a lien on the judgment or decree obtained, as explicitly stated in the opinion, page 127. *McKelveys Appeal,* 108 Pa. St. 615, is simply an allowance to an attorney recovering a fund.

Now, as to English cases. They do not bind us as authority. The case of *Irving* v. *Viana,* 2 You. & J. 70, is the nearest approach to oppositeness of those cited. It asserts that "a solicitor has a lien on a fund in court produced by his exertions," which seems somewhat *obiter,* for the application for payment was denied. It is otherwise unsatisfactory. One judge says the solicitor could have no lien except on costs in equity payable to his clients, that is, recovered by him. No one would deny his right, on common principles, to a lien on a judgment for money recovered by him for costs. The other judge says that he concurred with his associate, and announced that, where a solicitor had gained a benefit for his client, he should not be deprived of a lien on a fund produced by his exertions. Did that relate only to a judgment for costs recovered? The chief baron limited it to that.

*Haymes* v. *Cooper,* 33 Beav. 431, was a case of specific performance; and a decree was made for the purchaser, who paid the purchase-money into court. A contest arose between defendant's attorney claiming a lien and an assignee of the money. The court held that the lien of a solicitor for his costs on a fund recovered by his exertions can not be affected by an assignment. It is sufficient to

say that here was money in court belonging to defendant, as a fruit of the suit; and the statute cited by the court provided that, in every case where an attorney should be employed to either "prosecute or defend any suit," he should have a lien on the property recovered or preserved by it. We have no statute giving a defendant's attorney a lien, as in England.

In the case of *Jones* v. *Frost*, L. R. 7 Ch'y App. 773, a solicitor brought suit to annul a deed for land as a cloud over title, and succeeded, and was held entitled to have an order in the case charging the land for his fee. The heading of the case cites the English statute just mentioned. That was the justification for the allowance. To establish such a lien on real estate would be fraught with grave danger to creditors and purchasers. It is a secret lien. No law requires it to be recorded. Courts did not favor the old secret vendor's equitable lien, because of its danger to purchasers and creditors. If this lien is established, how could a man credit on the faith of a tract of land which had been involved in litigation? How long does the lien last? What is its amount? Just what it may be proven to be. How could a seller or purchaser or creditor learn its amount until actual adjudication?

Another view has just occurred to me, on which I have not had the benefit of argument by counsel. It is clear that the claim of appellant is not a lien on land, as an attorney's compensation can not be a lien on land. This position has been yielded in oral argument on the rehearing. Now, when Lewis died, the land passed to his devisees and was land in their hands, and the surplus proceeds of sale after payment of debts remained land. It so strikes my mind, and the authorities sustain this view. The sale was not a conversion from land to money.

Mr. Pomeroy (3 Eq. Jur. § 1167) speaking of conversion by paramount authority, compulsory sales of lands under statute, and orders of court, says: "The question presents itself: Is the property, although *de facto* converted, to be treated to any extent as not converted?" and refers us to his note for the answer; and there we find it laid down thus: "Sale of land by order of court. Where land is

thus sold, and there is any surplus of money after satisfying the purpose for which the sale was made, such surplus is always regarded and treated as real estate. *Cook* v. *Dealey*, 22 Beav. 196; *Jermy* v. *Preston*, 13 Sim. 356." He states in his text that, "where land is sold by order of court for any purpose, it is a fixed principle, upon which the court always proceeds, that the character of the property should be changed only so far as may be necessary to accomplish the particular purpose." See 1 Lomax, Ex'rs, 222, 223.

On the death of a mortgagor the equity of redemption goes to his heirs, and the surplus of a sale under decree against the heirs to foreclose goes to them. *Shaw* v. *Hoadley*, 8 Blackf. 165; *Dunning* v. *Bank*, 61 N. Y. 497; per Chancellor KENT in *Moses* v. *Murgatroyd*, 1 Johns. Ch'y 130; 2 Jones, Mortg. § 1913; *Chaffee* v. *Franklin*, 11 R. I. 578; *March* v. *Berrier*, 6 Ired. Eq. 524. Where a debtor gives a deed of trust to secure debts, and there is sale after his death, the surplus goes to his heir. 1 Lomax, Ex'rs, 225. Surplus proceeds of sale of land of decedent by order of court, to pay debts, remain realty. 2 Story, Eq. Jur. (13th Ed.) § 1214*a* elaborate discussion of cases; *Oberly* v. *Lerch*, 18 N. J. Eq. 346; *Pence* v. *Pence*, 11 Ohio St. 290. As the decedent left it, so it remains.

So I regard the surplus after paying debts as still land, as regards this claim, and that the attorney's claim for service before a sale is not a lien. When the service was rendered the land had not been sold. If it could not be a lien when the service was rendered, how could it become a lien afterwards?

What was the service of appellant? In 1859, in the suit of Joab and Thomas Fowler, as children of Thomas Fowler, against Lewis's Estate the appellant filed a demurrer, which was overruled, and in 1860 he filed answers for two of the Lewis heirs. That suit ended in a decree for seven thousand five hundred dollars against Lewis's estate. It never went further; and about the same time he filed exceptions to the commissioner's report in that case. In 1859 and 1860, in the suit of Margery Kenna against her brothers to overthrow the will of her father he defended for two of the brothers. This suit was compromised in 1866. In 1881

the creditor's suit of *Carr* v. *Lewis's Estate*, which, when Carr's debt was paid, was ordered to proceed in name of E. M. Fowler as plaintiff, and in which the land was sold, he defended nothing for the estate; but in 1885 he defended John W. Lewis and Andrew D. Lewis against debts against them. The appellant claims one thousand five hundred dollars for services in the Margery Kenna suit, and one thousand dollars in the original suit of the Fowlers against Lewis's Estate, which ended with a decree of seven thousand five hundred dollars against the estate and is not the suit in which the land was sold. Now, at the dates when such services were rendered, was not the land yet land? It was not sold for years afterwards.

This claim can find no support either under the letter or spirit of the case of *Renick* v. *Ludington*, 16 W. Va. 378. It says: "An attorney has a lien on the judgment or decree obtained by him for his client for his services and disbursements in the case." Did J. S. Swann recover a judgment? No; for the judgment was against his clients; and the services for which he claims were not in the same case in which the land was sold, but other cases, and those cases not so connected as to make them the basis of the recovery of a debt, or even for the continued defence of the estate.

In the case of *Renick* v. *Ludington*, the attorneys engaged for Renick to recover of Ludington a debt under a contract between them. Ludington sued Renick to set aside that contract, so as to overthrow the debt. The same attorneys successfully defended this suit, and then recovered judgment for Renick against Ludington for the said debt. The court held these attorneys had a lien for services in both those suits; the court saying the lien covers not only the services "in the case in which the judgment or decree is rendered," but also the services "in any other case so connected with it as to form the basis on which such judgment or decree is rendered, or essential to the realizing of such judgment or decree." Compare these two suits between Renick and Ludington—the one the salvation of the other, without the defence of which there would be no debt, practically a part of the process to realize the debt—

with the connection between the Fowler and Kenna suits against Lewis's estate, and the Carr suit against Lewis's estate, and see if the relationship is not wholly different.

But it is strenuously urged that the fund is in court, and, being in court, the court has a peculiar power over it because of that fact. The court has no power over it save to apply it to rights existing when it came into court. As the master of the rolls said in *Cook* v. *Dealey, supra,* the sale converts the land into persoualty "only to the extent of the object required, but beyond that the rights of all parties remain the same as if no conversion or sale had taken place." The appellant had no lien either when he rendered service or at date of sale, for it was land of the devisees. What magical influence creates this right to charge for the attorney's demand? Only that it is in the grasp of the court. But the court holds it in trust only for rights attaching to the land and the court can give only to proper owners. Can create a right by its order which is non-existent? In note on page 971, 1 Am. & Eng. Enc. Law, it is laid down that there is no lien for attorneys of distributees on a fund in court for distribution.

I can not concur in establishing the doctrine that when a fund belongs to an estate, simply because it is in the hands and power of a court, it shall be made to pay the fees of all the attorneys—plaintiff's or defendant's—connected with the case. If a dead man's estate is before the court, shall attorneys who may have resisted some claims against the estate be allowed large fees . as a lien upon the assets? I know no law for it. Establish the practice, and the door is open wide to the demand of exorbitant fees, to the ruin of estates—taking from widows and children moneys which should sustain and comfort them. Some witnesses would rate the fee at high figures; others, less. The court allows heavy compensation. Rarely could an appellate court remedy it. If, simply because a fund is in court, such arbitrary allowances may be made in the case of a dead man's estate, why in every case of enforcement of judgments or mortgage liens may not a lien be declared in favor of attorneys defending against such liens? Has the practice ever prevailed in Virginia? I can not concur in

the introduction of the innovation by mere judicial action. The attorney is competent to take care of himself. If his compensation is not assured, he can decline to render service. If he renders it, let him make his contract and secure himself.

If the law, as it is, be not sufficient, let the legislature make proper regulations, as in England and many of our States has been done. I certainly am disposed to be fairly liberal to my own profession, but not at the sacrifice of the interests of the many. I do not think that it would confer a benefit upon that honorable profession, comprising the brightest men and leaders in society, trusted by the public with their most vital, sacred and important interests, private and public ; but it would in the end bring the whole bar into disrepute and unpopularity, by the improper and cormorant use which would often be made of the rule by the least meritorious of its members. An abuse we know it has become where it prevails. The United States Supreme Court in *Trustees* v. *Greenough*, 105 U. S. 527, condemns the practice of allowing large fees out of trust-funds now prevalent, and Mr. Justice MILLER, in the same case, dissented and called it a "gross judicial abuse of the present day, namely, the absorption of a property or a fund which comes into the control of a court by making allowances for attorneys' fees and other expenses."

The suggestion is made, though it was not in the argument claimed to have any influence in the case, that the land was partnership property between Fowler and Lewis. If joint between them, of course the moiety of each joint tenant would be realty, not personalty. But in fact the six thousand and six acres of Bull Creek land was not joint property but belonged to Lewis, and Fowler claims no share in it. The bill of the Fowlers against Lewis's estate, filed in 1858, asserted that Fowler and Lewis had been joint owners of a tract of twenty one thousand and twenty six and a half acres, and that Lewis purchased it at a sale for taxes in his own name and sold half of it to Allen M. Smith, and that Lewis and Smith sold to divers persons parcels thereof and received the purchase-money, leaving a small residue unsold; and the bill, on the theory that Lewis

bought the land and could hold it only for the equal benefit of Fowler and Lewis, and that Smith purchased half from Lewis with notice of Fowler's right, sought to make Lewis's estate and Smith account for proceeds of what they had sold, and to have a partition of the unsold residue; and the bill itself alleged Lewis to be owner of the Bull Creek land, never intimating or making any claim that Fowler ever had any interest in it; and it was attached in the suit to answer the debt of Fowler, and the bill asked that it be subjected to the debt. How can this land, for any purpose or in any way, be called or referred to as partnership land?

Our decision is as follows: Upon the appeal of Peter Fontaine, administrator of Sarah E. Lewis deceased and others, to affirm the decree of July 14, 1885, rendered on the petition for rehearing filed by P. W. Morgan, administrator, and others, vacating, to the extent therein specified, the decree of 15th of October, 1866, which confirmed the report of Commissioner Polsley; to affirm also the decree of July 15, 1885, rendered on a petition for rehearing filed by Nicholas Fitzhugh, vacating, to the extent therein specified, said decree of 15th of October, 1866; and to reverse the decree of July 1, 1890, so far as it disallows and rejects as a lien, as to John W. Lewis, the judgment in favor of Sarah E. Lewis against Andrew D. Lewis and John W. Lewis for six hundred dollars with interest from 6th May, 1885, and eleven dollars and sixteen cents costs, because it is a lien as against lands of John W. Lewis, and to affirm said decree of 1st July, 1890, in all other respects.

As in consequence of the allowance of the lien of said judgment the decree of July 2, 1890, distributing the fund under the control of the Circuit Court, and directing the Kanawha Valley Bank to pay moneys on deposit with it, becomes erroneous in part, that decree is reversed, so far as it directs the distribution and payment of the share of John W. Lewis, amounting to three thousand one hundred and twelve dollars and thirty six cents, with direction to the Circuit Court to enter a decree re-distributing the share of said John W. Lewis in said fund, allowing said judgment in favor of Sarah E. Lewis against Andrew D. Lewis and John W. Lewis for six hundred dollars as a first lien

on said John W. Lewis's share in said fund, and then the residue as in said decree specified.

Our decision upon the appeal of John W. Lewis is to modify the decree rendered on July 2, 1890, so that the right of N. Fitzhugh or his assignees to three fourth parts of the interest of John W. Lewis in the proceeds of the sale of the land shall be subject to the judgment of six hundred dollars with interest from May 6, 1855, and eleven dollars and sixteen cents costs in favor of Sarah E. Lewis against Andrew D. Lewis and John W. Lewis as a first lien, prior to the judgment of R. J. Ashby in said decree mentioned, and, as thus modified, to affirm said decree.

Our decision on the appeal of James V. Lewis and wife is to reverse the decree of July 2, 1890, so far as it confirms the report of Commissioner Ruffner as to the assignment made by James V. Lewis and wife to Thomas L. Broun, and decrees that said Broun and his assignees are entitled to the proceeds arising from the several assignments made by James V. Lewis and wife to said Broun, but without prejudice to Broun.

Our decision on the appeal of John S. Swann is to affirm the decree of July 1, 1890, denying him the relief prayed for in his petitions and amended petitions.

The cause is remanded to the Circuit Court for further proceedings to be had, according to principles in this opinion indicated, and further according to principles governing courts of equity.

Holt, J. (*concurring.*)

In my opinion the legal services of the attorney came to an end leaving the Bull Creek property still land ; and on all sides it is conceded that the lien for such services does not attach to real estate. So that, although concurring in the order to rehear, I am constrained to concur in the affirmance of the decree of the Circuit Court.

Lucas, President (*dissenting.*)

This case comes before the Court upon a rehearing, a petition to that effect having been heretofore filed and allowed. The case will be found fully stated in the

original opinion of the court, and we adopt that statement. That opinion was at the time concurred in by every member of the court, as the most satisfactory solution of a case somewhat complicated and difficult.    That opinion discusses the right of the petitioner, Mr. John S. Swann, to assert a lien for professional services against a fund now under the control of the Circuit Court of Kanawha County.

So far as Mr. Swann's relation to the two cases of *Carr* v. *Lewis's Heirs, etc.,* and *Ashby* v. *Same,* is concerned, we see nothing to change in or add to the opinion as already announced.    It was in reference to his services in behalf of the administrator and heirs of John Lewis, in the case of *E. M. Fowler and others* v. *John Lewis's Adm'r and others,* that a serious doubt was occasioned in the minds of some members of the Court, both as to the merits of the case, and as to some of the principles set forth in the syllabus. This doubt has occasioned a more thorough search into the principles governing the relations of an attorney and client, as heretofore decided by our own Court.    Our own cases would seem to settle the following principles :

An attorney has a right to a reasonable compensation for professional services rendered to his client, whether he has conducted his case to a final decision or not—whether it has been compromised, or the attorney discharged and superseded by other counsel ; and such attorney may recover in a court of law upon a *quantum meruit.    Polsley* v. *Anderson,* 7 W. Va. 202.    As a lawyer acts under his official oath, and is responsible to the court for the proper and faithful discharge of his duty, the presumption is in favor of his authority to act for any person for whom he appears.   *Low* v. *Settle,* 22 W. Va. 387, 392.    And, finally, an attorney has a lien on the judgment or decree obtained by him for his client for services and disbursements in the case, whether the amount of his compensation is agreed upon or depends upon a *quantum meruit.    Renick* v. *Ludington,* 16 W. Va. 378.

The question whether or not the attorney's lien extends to real estate has never before arisen in this State, and we have, therefore, to set precedent, rather than to follow.    In England there have been decisions both ways, until the

question was settled in favor of the lien by act of parliament. 23 & 24 Vict. c. 127, § 28; *Barnesley* v. *Powell*, Amb. 102; *Shaw* v. *Neale*, 6 H. L. Cas. 581. In several of the States the lien upon realty has been sustained—notably in Tennessee and Georgia—while in Illinois, Michigan, and other States the lien has been confined to personalty. See *Brown* v. *Bigley*, 3 Tenn. Ch'y 618; *Wilson* v. *Wright*, 72 Ga. 848.

In this conflict of authority, and in the absence of all decisions upon the point in this State or Virginia, we are at liberty to decide the question in such manner as may be most conducive to public policy, and in accord with the spirit of our registration laws. The latter laws have been from time to time expanded in such manner as to distinctly indicate a legislative policy to abolish all secret trusts and liens upon real estate.

Thus, in the case of *Withers* v. *Carter*, 4 Gratt. 407, it was held that, while a deed was void as to creditors and purchasers without notice unless duly recorded, yet an executory agreement or similar writing need not be registered in order to effect a lien upon real estate. Thereupon the legislature, with reasonable promptness, enlarged the act by amendment so as to include all executory writings. And so the lien for purchase-money, which had existed from time immemorial, was finally abolished, except in cases where declared by an instrument duly recorded, either by way of reservation or direct grant. Code 1891, c. 75, § 1, p. 652.

The question then remains, whether we should not be controlled by the enlightened and remedial spirit of our registration laws. I am decidedly of opinion that we should be so governed, and that we should not give our sanction to any new and secret lien upon real estate. This disposes of the question, so far as the interest of Mr. N. Fitzhugh is concerned, and all other purchasers of land from the Lewis heirs, who purchased without notice, and have the legal title.

The only remaining question to be disposed of is whether or not the appellant Mr. Swann is entitled to be compensated out of the fund now in court for services rendered to

the heirs and administrator of John Lewis in the suit of E. M. Fowler, *et al.* against said heirs and administrators, under the conditions and exceptions already noticed, as to vendees of the realty.

I do not think, in our former opinion, we paid sufficient attention to what this Court had already decided in *Renick v. Ludington*, 16 W. Va. *supra.* Careful attention to an analysis of that case would have relieved us of some difficulties which apparently were not very happily surmounted. That case establishes the following propositions as law in this State: (1) The attorney's lien may attach upon a judgment or decree obtained for a plaintiff for services rendered to him in a prior case, in which he was defendant, if the prior case were so connected as to form the basis of the ultimate recovery. (2) The lien is not limited to taxable costs, but extends to reasonable compensation for legal services actually rendered. (3) The lien is not by virtue of any statute, but exists at common-law. (4) It is an equitable lien and has priority over all intervening assignments of the judgment, whether made with notice or without.

This case, therefore, effectually disposes of the question as to whether there can be a lien in favor of the attorney who gives his services for a defendant, when such services lead up to an ultimate recovery of a fund, the fruits of the attorney's labor, or to which his labor has contributed. The whole spirit of this decision, as embodied in the able opinion delivered by Judge GREEN, is comprehensive and liberal, basing the argument, not upon barren technicalities, but upon equity and just reason. In this case Judge GREEN says:

"While the lien of the attorney is a special lien for his services in obtaining the particular judgment or decree only, yet the principles on which it is based obviously extend the lien to all his services rendered in obtaining the particular judgment or decree, though those services may not all have been rendered in the particular suit in which the judgment or decree was obtained, but were in part rendered in other suits, all tending to and finally ending in the judgment or decree on which the lien is claimed." * * * * "The lien of an attorney on his client's judgment

was allowed in England, not because his fees were taxed in the costs, but was founded in natural equity, which forbids that a party should enjoy the fruits of a cause without satisfying the legal demands of his attorney."

The doctrine thus enunciated by Judge GREEN, and concurred in by the full Court, was no new doctrine, but was taken, not only in spirit, but almost in the very letter, from the highest courts of England, as expressed more than fifty years before the attorney's lien was fixed by act of parliament. *Wilkins* v. *Carmichael*, Doug. 101; *Read* v. *Dupper*, 6 Term R. 361.

The inquiry, therefore, as to a fund under the control of the court relates, not to the position of the beneficiaries as plaintiffs or defendants, but more properly to the question whether those beneficiaries are about to distribute a fund among themselves which their attorney has preserved for or secured to them, or has materially aided by his services in such advantages and benefits. For example, take the case of two partners, one of whom sues the other for a settlement and account. Eventually a large balance is decreed in favor of one partner as against the other. The attorney of the successful partner petitions the court for compensation out of the fund resulting as the fruits of the litigation. Now, what possible difference can it make whether such successful partner was plaintiff or defendant? In conscience, reason and common sense the attorney is equally entitled to compensation from the fund to which he looked and which he has preserved, whether his successful client figured on the record as plaintiff or defendant.

This point is substantially settled by *Renick* v. *Ludington*, *supra*. The first case arising between those litigants was one in which Ludington sought to set aside a contract. Renick was there defendant, and was successful. His attorney then instituted an action in his name against Ludington upon the contract unsuccessfully assailed, and obtained a judgment. Upon this judgment this Court held that the attorney was entitled for his services rendered as well in the case where Renick was defendant as where he was plaintiff; and it is very illogical, not to say idle, to suppose, if the judgment had been rendered in the first

suit, without the necessity of a resort to a second, that this Court would have refused to enforce the lien of the attorney upon the ground that his client was a defendant.

These principles, easily deducible from the broad and comprehensive views of our own Court, are abundantly sustained by authorities. Thus, it has been said by Mr. Weeks: "The lien of a solicitor upon a fund in court, which is the result of the proceedings, can not be defeated by the subsequent insolvency of the client. The assignees of the insolvent can only take the property subject to the claims by which it was affected against him." Weeks, Attys. § 368. Again: "The particular lien also attaches to the fruits of the judgment or decree which the attorney's services have obtained. But it is said he has no lien on a cause till judgment is entered. The lien attaches to money payable to the client under the judgment or by virtue of an award, or paid or payable into court in the course of an action at law or in equity, or to real estate recovered by a solicitor prosecuting a suit in equity to a decree; and the lien has been held to attach on sums received or payable upon compromises, even where the verdict and judgment were against the client, on the ground that the money is the fruit of the labor and skill of the attorneys." Id. § 369.

To show that our courts are not governed, in regard to this lien, by any narrow or contracted spirit, we may cite the decision of the Supreme Court of the United States in a very novel and interesting case. The question arose whether the lien of an attorney would attach for his services in an award made by an international commission; and the court held that it would. This was upon the broad and general principle that the question should be tested by the criterion of whether or not the fund about to be obtained or distributed had been secured or materially increased by the attorney's services, and not by any technical or subsidiary question as to the nature of the proceeding or the relation of the client, as plaintiff or defendant. *Wylie* v. *Coxe*, 15 How. 415.

Let us now apply these principles to the case in hand, so as to ascertain whether, in the opinion originally ren-

dered, we did not to some extent misconceive both the principles of the law as settled in our own State, and their application to one particular branch of the controversy before the Court.   Let us revert now to certain facts disclosed by the record and undisputed.   In the original suit of E. M. Fowler against Lewis's administrator and heirs, the first appearance by all the defendants is through the appellant J. S. Swann, who it seems, filed a demurrer in their behalf. If at that time he had any associate counsel, it was Mr. Broun, who, it appears from a letter of his (to be found in the record) relied upon this demurrer as one which would probably defeat the Fowler claim.   Now, as we have seen, this appearance by Mr. Swann is *prima facie* evidence of his right to represent the heirs and personal representatives of John Lewis.   Has this *prima facie* case been anywhere sufficiently rebutted in the testimony.

The unsworn to answers of the heirs and administrator, denying such employment, is no evidence at all; and the testimony of associate counsel might very properly be interpreted as not in direct conflict with that of Mr. Swann and his brother T. B. Swann.   The appearance was for all the heirs and the estate of John Lewis.   It appears, further, that the answer of Andrew D. Lewis, as domiciliary administrator or executor of John Lewis, was filed by Mr. Swann with the knowledge and by the authority of said personal representative.   That the domiciliary administrator had the right to employ counsel to defend the estate will hardly be seriously questioned.   At a later day, and after the civil war, in 1867, we find Mr. Swann filing exceptions to a commissioner's report, in which the debt due to Fowler was reported at a large sum.

It is objected that these exceptions were filed after Mr. T. L. Broun, who was associate counsel, had effected a compromise, which he thinks was substantially achieved some time in 1866.   But Mr. Broun further testifies that Judge Brown, who was representing the Fowler claim, refused to let the compromise become an accomplished fact until the court should confirm the sale of the Bull Creek lands, which confirmation was not obtained until the 9th of October, 1867.

While Mr. Broun was bringing about this compromise, and effecting the sale of the lands, and exercising rare ability and skill in accomplishing these beneficial results, it would seem to have been highly important to have some one at home, supervising the interest of the Lewis estate, as counsel for said estate and the heirs. This function, as appears by the record, was performed by Mr. Swann; and had Mr. Broun's efforts failed, as happily they did not, those of Mr. Swann would no doubt have been more conspicuously beneficial; and it is impossible to say how far his services influenced the representative of the Fowler claim to agree upon terms and consummate the compromise.

Still later on, in 1885, the record discloses a consent-decree with regard to the sale of the Bull Creek tract to one J. W. Humbird. It is signed by John S. Swann as attorney, though it is not stated for whom he appears; but the presumption is that the original employment continues, unless there is something to indicate a discharge by the client. This brings us down to within six weeks of the time of the filing of his first petition in the associated causes. Bart. Law. Pr. 75.

It would seem, therefore, that, from the origin of this suit down to the time when the fund now in court was realized, the record discloses the appearance of Mr. Swann as counsel. His *prima facie* case, therefore, is perfect, and we have not been able to find any sufficient evidence tending to rebut or overthrow it.

As we have seen, the attorney's lien attaches to a judgment or decree in favor of his clients, whether they be plaintiffs or defendants; and if the service is admitted or proved by the record, in the absence of any specific contract, he has a lien upon the fund under the control of the court, and about to be distributed, for a *quantum meruit* compensation. It will be observed that in this branch of the case the question whether an attorney has a lien upon realty is not at all involved. This was a suit by one partner against his copartner for an account and division of assets. The realty as to which the claim was asserted was attached, and under the dominion of the court. It was

sold finally, not by judicial process at public auction, but by consent and by agents appointed by the court, whose private sale the court had to confirm and did confirm before it became effectual to convey title. Upon the plane which our own Court has reached, and which, indeed, was attained by the common-law, we must be governed, not by technicalties, but by what Lord Kenyon styled "the convenience, good sense and justice of the thing." See *Ormerod* v. *Tate*, 1 East 465.

To assert a lien and enforce it upon a fund such as that now in the hands of the court, would be accompanied by none of the inconveniences which, as we have seen, would attend the lien if fastened upon the land itself in such manner as to interfere with its alienation. Where the reason for excluding this lien from the realty ceases to exist, the exclusion itself is left without reason to support it and should not be applied.

As was decided in *Renick* v. *Ludington, supra*, those who have acquired, not legal titles, but mere equitable titles, by virtue of assignments, must be held subordinate to the lien of the attorney, because, as Judge Green explains, between equities, other things being equal, the first shall prevail. *Qui prior est in tempore, potior est in jure.*

The lien attaches in favor of Mr. Swann upon the decrees in the cause and the interests of his clients thereunder. See *Irving* v. *Viana*, 2 Younge & J. 70.

With reference to the amount, as the opinion of the majority of the Court is adverse to the claim, it is not necessary to make any observations. In justice to Mr. Swann, however, the fact that he expresses his willingness to take "whatever the court and commissioner may think right" should shield him from any adverse criticism, or animadversion upon the nature or extent of his claim. Certainly a case of this character does not call for any severe strictures upon the practice of the profession in this State with reference to asserting liens upon the funds of their clients under the control of the court. The case of *Renick* v. *Ludington*, was one in which the demand of the attorneys bore a very much larger proportion to the fund recovered, and yet the eminent jurist who delivered the opinion of the

Court in that case did not feel called upon to contribute anything to the ethics of the profession upon the subject of overcharging for services rendered.

MODIFIED. AFFIRMED.